Henry LAFFERTY and Betty Jo Lafferty, Plaintiffs-Respondents,

v.

Elmer Alvin WATTLE, Defendant-Appellant.

No. 7957.

Springfield Court of Appeals.

Missouri.

Aug. 11, 1961.

Motions for Rehearing or to Transfer Overruled Sept. 27, 1961.

Bock & Jones, New Madrid, for defendant-appellant.

Ward & Reeves, Caruthersville, for plaintiffs-respondents.

PER CURIAM.

This is an appeal from a judgment for plaintiffs, parents of Judith Lafferty (age thirteen), who met her death in a rear-end vehicular collision on Sunday, March 1, 1959. After a nine-man verdict in the sum of $25,000 and forced remittitur in the sum of $10,000, defendant Wattle has appealed.

The tragedy occurred at dusk or shortly before (car lights had not yet been turned on) on a state-maintained highway officially designated as Route Y at a place approximately 2.4 miles south of Caruthersville, Missouri. This highway runs south of a three-way intersection with Caruthersville's main street and Missouri State Highway 86. Route Y is paved with blacktop 19 feet wide. At the scene of the collision the road runs approximately straight and level for a mile or so in both directions, so there is nothing to interfere with vision "as far as your natural eye will let you see." The day was somewhat dark and cloudy. The pavement was dry. The shoulders were dirt covered with grass and were (by the state trooper) some four feet or (according to defendant) something like eight feet to five feet in width. The witnesses agree that there had been some rain at some time before and the shoulders were "a little" wet but were solid and were "not too wet to pull off." No vehicles, other than the two involved, were concerned in the collision, and there was no nearby traffic.

Defendant Wattle was driving a 1952 GMC two-ton truck, which he says was in good mechanical condition, with a solid grain bed 15 feet in length. The sides of the grain bed extended upward four feet. There was no tailgate, so the rear end was open, and the owner had cut a gap in the front end of the grain bed, thus enabling him to look through the rear window of the cab. The truck had no rear vision mirror inside the cab but did have one on the driver's side, thus permitting another view to the left rear. The lights of the truck had not been turned on. Defendant was a farmer living some four and one-half miles south of Caruthersville. On this occasion he, with his wife beside him, was driving south. He said he was driving "35 or maybe 40"

miles per hour as he neared the scene of the accident.

In the meantime Judith had met, in the picture show, a friend by the name of Jack Hostage Bailey, age sixteen at the time of trial. Robert Goodale came in and asked them to go riding. They picked up another girl, Kay Thrasher, and drove around south of Caruthersville. Goodale was driving. Kay was in the right front beside him. Bailey sat in the left rear behind the driver, and Judith sat in the right rear. They came off a gravel road and turned south on Route Y about one to one and one-half miles south of Caruthersville. Bailey, who was a witness, was interested in talking with Judy and when he first noticed defendant's truck they were, so he said, about 100 yards behind it. His estimate of the Chevrolet's speed was 40–45 miles per hour. The truck was "going down the road" at the same estimated speed. They "weren't running up behind it" and "were not gaining any speed on it." Bailey then leaned back in his seat and, presumably, turned his attention to Judith.

Now enter the hitchhiker. Paul Smithson, who worked on a farm in the general neighborhood, had been to the show in Caruthersville and was walking home. Defendant Wattle recognized him and slowed down to pick him up. "They passed me (Smithson) on by and it was slowing now, and I run and jumped up on the truck (the rear end). He (Wattle) was moving when I got on the truck. I couldn't say if he was stopped or not. About the time I got on the truck the car hit." Peculiarly enough, this witness never saw the Chevrolet at any time until after the collision. When he jumped on the rear end of the truck he never looked back.

Defendant Wattle said that he recognized Smithson, the hitchhiker, when 80 or 90 yards from him and that he applied his brakes and began to slow down. He did not look to the rear either through his rear window or by glancing at the side mirror. He did not give any hand or arm signal, did not turn on any signal light, and did not turn to the right. He was "just about in the middle of my own lane." He said that he could have seen to the rear had he looked, "but I had my mind on going home, and I just held my side of the highway." He never saw the Chevrolet until after the accident. He asked his wife, "Is the boy on?" and she said "yes." Then he heard a "lick" and saw the Chevrolet go by on his left and the (sheared) top flying off. He estimated that, from the time he recognized Smithson and started to slow down until the collision, his truck traveled "I imagine" about 100 yards; that he did not come to a complete stop when Smithson got aboard but was traveling "maybe three or four miles an hour or something like that."

Bailey, the passenger in the rear seat of the Chevrolet, testified that, after first having seen it 100 yards down the road, he next saw the truck when the setting of the brakes of the Chevrolet "raised me up and I looked." He felt the brakes take hold and that threw him forward. He then saw the truck again, this time about 20 yards ahead, and the hitchhiker "five or ten yards" from the truck and running toward it. The truck was in its own lane on the pavement with its right wheels about a foot from the pavement edge and was either stopped or moving very slowly. "From what I could see it was almost stopped." He said that he saw no lights on the rear of the truck, in fact no lights at all. (On cross-examination he said he wasn't looking for any taillights.) He heard the brakes on the Chevrolet scream "a little while." The Chevrolet was then near the center of the road. The car turned to the left after the brakes were applied and slowed "a little bit." "There wasn't room to pass," "not from that close."

The Chevrolet struck the left rear corner of the truck, shearing off the angle iron which held the taillight under the bed, and Judith sustained injuries from which she shortly died.

**■** We have, perhaps unnecessarily, related these facts in undue detail because, in the type of submission involved, the whole surrounding circumstances are important.

We have also, as we are bound to do after a verdict and judgment, taken those facts which we believe are most favorable, or from which the most favorable inferences may be drawn, in support of plaintiffs' verdict.

Defendant stood on his motion for directed verdict and offered no evidence.[1]

The plaintiffs submitted their case on a principal instruction which first hypothesized the situation on the road in general terms, the character of the road, the location of the collision, the fact that defendant was driving his truck down the road and the Chevrolet in which Judith was riding was following it,

"* * * and that said collision and the said death of Judith Diane Lafferty was directly and proximately caused by the failure of defendant, Elmer Alvin Wattle, to exercise the highest degree of care, if you so find, *in one or more of the following particulars:*

1. Portions of defendant's testimony, to which reference has been made, were from his deposition offered by plaintiffs.

2. V.A.M.S. § 304.019. "No person shall stop or suddenly decrease the speed of or turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided herein.
"(1) *An operator or driver when stopping, or when checking the speed of his vehicle, if the movement of other vehicles may reasonably be affected by such checking of speed, shall extend his arm at an angle below horizontal so that the same may be seen in the rear of his vehicle;*
\* \* \* \* \*
"(4) The signals herein required shall be given either by means of the hand and arm or by a signal light or signal device in good mechanical condition of a type approved by the state highway patrol; however, when a vehicle is so constructed or loaded that a hand and arm signal would not be visible both to the front and rear of such vehicle then such signals shall be given by such light or device. A vehicle shall be considered as so constructed or loaded that a hand

"First: If you find that defendant, Elmer Alvin Wattle, checked the speed of the said 1952 GMC two-ton truck at a time and place when the movement of the 1957 Chevrolet in which Judith Diane Lafferty was riding would be reasonably affected by said checking of speed, and would create an immediate hazard and the said defendant, Elmer Alvin Wattle, failed to extend his arm at an angle below horizontal, or failed to give other timely and adequate warning of his intention to check the speed of the said 1952 GMC two-ton truck,[2] or

"Second: If you find that defendant, Elmer Alvin Wattle, drove and operated the said 1952 GMC two-ton truck at a speed of 3 or 4 miles per hour and such speed was such a slow speed as to impede or block the normal and reasonable movement of traffic and such speed was not reasonable necessary for safe operation;[3]

and arm signal would not be visible both to the front and rear when the distance from the center of the top of the steering post to the left outside limit of the body, cab or load exceeds twenty-four inches, or when the distance from the center of the top of the steering post to the rear limit of the body or load thereon exceeds fourteen feet, which limit of fourteen feet shall apply to single vehicles or combinations of vehicles. The provisions of this subdivision shall not apply to any trailer which does not interfere with a clear view of the hand signals of the operator or of the signalling device upon the vehicle pulling said trailer; provided further that the provisions of this section as far as mechanical devices on vehicles so constructed that a hand and arm signal would not be visible both to the front and rear of such vehicle as above provided shall only be applicable to new vehicles registered within this state after the first day of January, 1954."

3. V.A.M.S. § 304.011. "No person shall drive a motor vehicle at such a slow speed as to impede or block the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with law. Peace officers may enforce the pro-

"Then if you so find the facts, you are instructed that your verdict must be in favor (of) plaintiffs, Henry Lafferty and Betty Jo Lafferty, and against the defendant, Elmer Alvin Wattle."

*Did plaintiffs make a submissible case on both disjunctives?* Defendant contends that plaintiffs failed to make a submissible case because (a) there was no evidence that defendant abruptly or suddenly slowed his vehicle, (b) defendant was not required to give any arm signal because the statute expressly exempted him, (c) the testimony of Bailey as to not seeing any taillight was of no probative force, (d) there was no evidence that defendant "impeded or blocked the normal and reasonable movement of traffic," and (e) there was no substantial evidence that defendant's slackening of speed without signal was the proximate cause of the death of plaintiffs' daughter.

■ As to the sudden slowing of speed: We do not understand that the first paragraph of V.A.M.S. § 304.019 emasculates subparagraph (1) in the sense that the command of subparagraph (1) is limited to cases where there is a sudden checking of speed. It would seem that the first paragraph is a prohibition against sudden slowing except where the movement can be made with reasonable safety, and then only after signal. However, subparagraph (1) simply creates (or rather expresses) the duty to warn on any checking of speed which may reasonably affect the movement of other vehicles. It does not condition that duty upon a *"sudden"* decrease in speed. Subsection (1) has long been a part of the rules of the road [Section 8385(h), RSMo 1939; Bowman v. Moore, 237 Mo.App. 1163, 167 S.W.2d 675, 680; Woods v. Chinn, Mo. App., 224 S.W.2d 583, 586], and we do not find that it has received that construction, although "sudden" stopping usually is involved. However, the abruptness or

suddenness of the checking of speed is a proper subject of inquiry and argument under subsection (1) because the degree of abruptness could have a decided bearing upon whether the checking of speed would "reasonably affect" the movement of the following vehicle, depending, of course, upon the circumstances of the case. The words "suddenly" or "abruptly" are relative terms, dependent upon the surrounding circumstances. What might not be sudden in one instance might be so in another, and we cannot say as a matter of law that the checking of speed was not relatively "sudden" under the circumstances of this case. See Bowman v. Moore, supra, 167 S.W.2d loc. cit. 681. If we correctly interpret Pilkenton v. Fegley, Mo., 321 S.W.2d 435, 438, any stopping which blocks the path of a following vehicle, in a situation which calls for a warning signal, is "sudden" if made without timely and adequate warning. We think the same rule would apply to the checking of speed under the circumstances shown here.

■ It is argued that Bailey's evidence shows only that he saw the truck 100 yards distant and sometime later saw it going very slowly at a distance of 20 yards but that the interval of time between the two is unmeasured and indefinite. This overlooks other testimony. When driving at a speed of approximately forty miles per hour, defendant recognized the hitchhiker, put on his brakes, and slowed to three or four miles per hour within what the defendant estimated to be "about" 100 yards. The interval of *time* accomplished in "such checking of speed" is unmeasured, but it could not have been long. Defendant further argues that between the 100 yards and the 20 yards there remained a distance of at least 240 feet covered in the process of checking speed, and that this process was so lengthy that it could not "reasonably affect" the movement of cars behind. The

visions of this section by directions to drivers, and in the event of apparent willful disobedience to this provision and refusal to comply with direction of an of-

ficer in accordance herewith, the continued slow operation by a driver is a misdemeanor."

use of the arbitrary figure of 240 feet over-looks three things. First, the speeds and distances were the products of estimates made after the event and under conditions not conducive to yardstick accuracy. Under such conditions the parties are not held to fine measurements and degrees. They are to be treated as approximations, not as absolutes [Caffey v. St. Louis-San Francisco Ry. Co., Mo.App., 292 S.W.2d 611, 617; Janssens v. Thompson, 360 Mo. 351, 228 S.W.2d 743, 745; Long v. Mild, 347 Mo. 1002, 149 S.W.2d 853, 856], and the jury is entitled to take the *whole circumstances,* correlate the facts and, if such reasonably can be done from the evidence, arrive at a conclusion which may not exactly fit any of the estimates. Secondly, it is, we think, a matter of common knowledge that a *gradual* slowing of speed without signal might, under some circumstances, be more difficult to discern by the following driver than a sudden stop, and a jury reasonably might believe that the following driver would not become conscious of such slackening of speed by the forward vehicle until the distance between the two had lessened considerably. Woods v. Chinn, supra, 224 S.W.2d loc. cit. 586 (somewhat similar on the facts, including the hitchhiker). Thirdly, after the driver of the following car had become conscious of the slackening of speed ahead there still would have been the distance covered during reaction time and the physical contact of the brakes and the tires upon the pavement.

■ The jury could well have found that the driver of the Chevrolet had much less than 240 feet in which to discover and react to defendant's decrease in speed. There are too many relative factors involved in this situation to fix precisely as a matter of law any certain distance in which the checking of speed would or would not have reasonably affected the movement of the car in which deceased was riding. That was a question for the jury under all of the circumstances shown by the evidence and the reasonable inferences which might have been drawn therefrom.

■ Furthermore, defendant is in poor position to complain because in his sole cause instruction he submitted the fact that the driver of the Chevrolet was following so closely behind the truck that he could not avoid colliding with it if it slowed its speed. Banks v. Koogler, Mo., 291 S.W.2d 883, 888(12).

■ Defendant bases his contention that he was not required to give an arm signal on the fact that the truck bed was in excess of 14 feet in length. It is provided in V.A.M.S. § 304.019(4) that vehicles whose beds exceed that length shall be considered as so constructed that an arm signal would not be visible, and that the required signal "shall" be given by light or mechanical device. Carrying defendant's argument to its logical end, the truck would have been exempt from brake or mechanical signals because it was a 1952 model, since the statute exempts from the mechanical signal requirement all vehicles registered prior to January 1, 1954, and thus defendant would not have been required to give *either* an arm or a mechanical signal. We do not so read the statute. We think that by its plain terms the statute requires one, who checks his speed when the movement of other vehicles will reasonably be affected, to give warning of such action. The statutes governing the regulation of traffic must be correlated and harmonized [60 C.J.S. Motor Vehicles, § 268, p. 648; Stutte v. Brodtrick, Mo., 259 S.W.2d 820, 827; State v. Bern, Mo.App., 322 S.W.2d 175; Kenney v. Hoerr, 324 Mo. 368, 23 S.W.2d 96], always bearing in mind that the foundation of legislative intent is to require users of motor vehicles upon public highways to exercise the highest degree of care. V.A.M.S. § 304.010; Thaller v. Skinner & Kennedy Co., Mo., 315 S.W.2d 124, 130. Statutory rules of the road set merely a minimal rather than a maximal standard of care, and they are not necessarily preclusive of common law negligence. Gooch v. Avsco, Inc., Mo., 337 S.W.2d 245, 251; Terrell v. McKnight, 360 Mo. 19, 226 S.W.2d 714, 716–717. And even if the

statute did not require such as a minimal precaution, defendant still would be subject to the general rules of negligence. One who so manages his vehicle that 'it is likely to create a hazard to other vehicles may be guilty of negligence in failing to give some adequate signal of intention to make such movement. 60 C.J.S., Motor Vehicles, § 301a, p. 710; Phillips v. Henson, 326 Mo. 282, 30 S.W.2d 1065; Nance v. Lansdell, Mo.App., 73 S.W.2d 346; Davidson v. Moore, Ky., 340 S.W.2d 227. Running through all the stop and decrease speed cases is the law that the test of any warning is whether it is adequate and timely under the circumstances then involved. Matthews v. Mound City Cab Co., Mo.App., 205 S.W.2d 243; Pilkenton v. Fegley, supra, 321 S.W.2d loc. cit. 438; Knox v. Weathers, 363 Mo. 1167, 257 S.W.2d 912; Ritz v. Cousins Lumber Co., 227 Mo.App. 1167, 59 S.W. 2d 1072; White v. Rohrer, Mo., 267 S.W.2d 31; Daly v. Schaefer, Mo.App., 331 S.W.2d 150.

■ There would still remain, in most cases (although not in this), the question of contributory negligence; and there would always remain the question of proximate cause. In this portion of his brief, defendant contends that there is no evidence which indicates that the arm signal would have been seen and acted upon. Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240. Although we have the width of the truck bed (estimated at seven feet, eight or ten inches), we have neither the height nor width of the cab, and we do not know how far the bed protruded beyond the cab. But the evidence does show that the Chevrolet was not immediately behind and directly in line (Indian file) with the truck, but was to the left and toward the center of the highway, whereas the truck was nearer the west edge of the pavement. So the line of vision was wider between the driver of the Chevrolet and the driver's side of the cab of the truck. We cannot say as a matter of law that, had a hand signal been given, and given in time, it would not have been seen and acted upon. Woods v. Chinn,

supra, 224 S.W.2d loc. cit. 586; Peck v. W. F. Williamson Advertising Service, Mo. App., 68 S.W.2d 847, 850.

Another contention of defendant is that there is no probative evidence that the taillight of the truck did not show. There was no evidence that the truck was equipped with a light which functioned when the brake was used, but for the purpose of this opinion we will assume such is so. The only evidence on this question came from the boy Bailey, who testified (without objection except upon one occasion as to the form of the question), "It raised me up and I looked." The truck was "either stopped or moving real slow" and he saw no lights on the rear of the truck. Defendant contends that this is negative testimony which was not sufficiently substantial to take the case to the jury on the question of failure to give a light signal in the face of the presumption that the truck was in good mechanical condition and the taillight was functioning.

■ A negative fact ordinarily must be demonstrated by negative evidence. Negative evidence that "I did not hear" or "did not see" is positive, probative evidence where it is probable or "reasonably certain" that the witness could and would have seen or heard had the event occurred. Chamberlain v. Thompson, Mo., 256 S.W.2d 779; Paisley v. Kansas City Public Service Co., 351 Mo. 468, 173 S.W.2d 33. The test is as to whether it is probable or reasonably certain that the witness would have seen and heard had it happened. Of course, this depends upon the proximity and position, the attention or lack of attention of the witness, and the surrounding circumstances. Dickerson v. Terminal Railroad Ass'n. of St. Louis, Mo., 284 S.W.2d 568; Knorp v. Thompson, 357 Mo. 1062, 212 S.W.2d 584, 588, 5 A.L.R.2d 103. The shortness of time in which to see and observe is not necessarily a disqualifying feature. In at least one case [Johnson v. Cox, Mo., 262 S.W.2d 13] it has been held that one-sixteenth of a second's glimpse was sufficient upon which

to judge the speed of a moving vehicle. Witness Bailey was to the rear of the truck and facing forward, thus in a position to see a taillight had it been visible. At 20 yards away he was "raised up" by the application of the brakes, and he did see the truck but no light. We cannot say that this evidence was without probative effect, and beyond that its weight was for the jury.

■ An objection to the second submission is that there is no proof that defendant's speed was such as to block or impede the normal and reasonable movement of traffic because this was a rural road and there were no vehicles in the immediate vicinity other than the Chevrolet behind. The truck was on its own right side and there was room for the Chevrolet to pass; and (so it is contended) the statute is intended to cover slow-moving vehicles on busy highways in situations where there is oncoming traffic. We think that the slow-speed statute [V.A.M.S. § 304.011] is a legislative recognition of the fact that, under certain circumstances, dawdlers, as well as speeders, can become a menace to the safety of their fellow motorists. We do not find that it has come under the scrutiny of the courts of this state, but similar slow-speed statutes have been construed in some sister states, and the general interpretation seems to be that the statute is applicable "whether the traffic it impedes be approaching from the front or rear, or from both directions." Angell v. Hester, 186 Kan. 43, 348 P.2d 1050, 1056. See annotation 66 A.L.R.2d 1194. Traffic in the vicinity, other than the vehicles involved, is not necessary to make the statute applicable.[4]

■ Under such a statute which does not fix the specific rate of speed, the question of whether the speed involved is so slow as to block or impede normal and reasonable traffic is, broadly, one for the trier of the fact, when reasonable men could so find. Pohlman v. Perry, 122 Ind.App. 222, 103 N.E.2d 911, 915; Netterville v. Crawford, 233 Miss. 562, 103 So.2d 1. See also Gantt v. Hobson, 240 N.C. 426, 82 S.E.2d 384. But its application as a factual matter has practical limitations,[5] and there must exist circumstances which conform to the purpose and intent of the act before it presents a question for the jury.

■ In this case, defendant was driving on a straight, level, paved highway. He knew or should have known that other vehicles were likely to use such road and might be driving at any speed less than the maximum permitted by statute. He was at a place where there was, insofar as the road was concerned, no apparent reason for curtailment of speed (such as warnings, obstructions, intersections, dips, et cetera) or other existing condition which would cause a following motorist to anticipate that a driver in front would be driving at, or would slacken to, an unusually slow speed. Coupled with this is the important circumstance that he *had* been driving at forty to forty-five miles per hour. He knew or should have anticipated that any following motorist would have been driving at a normal speed. He could have known, had he but looked to see, that there was such a motorist behind him. Within a short distance he sharply reduced his speed to what was almost a "rolling stop," without pulling any part of his vehicle onto the

4. See the facts in Angell v. Hester, 186 Kan. 43, 348 P.2d 1050, 1051. There also seems to have been no other traffic in Templar v. Tongate, 71 Wyo. 148, 255 P.2d 223 (an "open country" case); or in Lee v. Smith, 253 Minn. 401, 92 N.W. 2d 117, court's syllabus 8 (a "country road" case); or in Netterville v. Crawford, 233 Miss. 562, 103 So.2d 1.

5. Thus, where the forward vehicle was held up by a road grader, Nash v. Christenson, 241 Minn. 164, 62 N.W.2d 800; where the vehicle has just turned onto the highway and has not had sufficient opportunity to gather speed, Satter v. Turner, 251 Minn. 1, 86 N.E.2d 85, 66 A.L.R.2d 1178; where the vehicle is ascending a hill and a greater speed is not "practicable," Mishoe v. Davis, 64 Ga. App. 700, 14 S.E.2d 187, 195; where the vehicle is making a turn, Howard v. Marchildon, 228 Minn. 539, 37 N.W.2d 833.

shoulder and without giving any warning of intention to slacken to such slow speed. This conduct was voluntary on his part and was not necessary for safe operation or to comply with any law. These circumstances, we think, warranted the submission under the slow speed statute. See Woods v. Chinn, supra, and Bowman v. Moore, supra.

The last of defendant's contentions in regard to submissibility is that the slackening of his speed was not the proximate cause of the collision because the collision was not one which he, even if negligent, could have foreseen.

There must be a causal connection between the act and the injury. Branstetter v. Gerdeman, supra; Downing v. Dixon, Mo., 313 S.W.2d 644, 650. Foreseeability of injury is sometimes employed as a test of proximate cause, but if it reasonably could have been foreseen or anticipated that the act was likely to injure someone, then the particular thing which happened or the manner in which the injury occured is of no consequence. 38 Am.Jur., Negligence, § 62, p. 713, et seq.; Ritz v. Cousins Lumber Co., supra, 59 S.W. 2d loc. cit. 1077; Hildreth v. Key, Mo.App., 341 S.W.2d 601, 603. See cases cited in Rogers v. Thompson, Mo., 284 S.W.2d 467, 471, reversed Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; 352 U.S. 521, 77 S.Ct. 459, 1 L.Ed.2d 515.

A comprehensive statement appears in Thebeau v. Thebeau, Mo., 324 S.W.2d 674, 678:

" 'Generally, it is sufficient to constitute proximate cause that the negligence charged was the efficient cause which set in motion the chain of circumstances leading up to the injury. The test is not whether a reasonably prudent person would have foreseen the particular injury but whether, after the occurrences, the injury appears to be the reasonable and probable consequences of the act or omission of the defendant.' * * * 'it is sufficient to constitute proximate cause that the negligence for which recovery is sought was the efficient cause which set in motion the chain of circumstances leading up to the injury itself * * *, and the primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the first so operating upon the others as to make it primarily productive of the injury.' "

We think that under the facts in this case reasonable men could have found that the injury flowed as a natural and probable, and reasonably foreseeable, result of the negligence of defendant, and that such negligence made up a material part of the whole negligence by reason of which the collision was caused to occur. Defendant's assignment in regard to submissibility is overruled.

*Instructions:* The foregoing discussion of submissibility takes care of part of defendant's complaints as to the instructions. In addition, complaint is made that the first conjunctive submission improperly commingles an "immediate hazard" finding, which is from a separate statute [V.A.M.S. § 304.021], without defining the term. No cases are cited to sustain this contention. It would appear to us that the words "immediate hazard" are not technical but are ordinary words and have a commonly understood meaning which requires no special definition.[6] And it has been held that "immediate hazard" cannot be defined because it has no precise set of measurements and must be judged on the basis of common

6. Similar to "imminent peril," Perkins v. Terminal R. Ass'n. of St. Louis, 340 Mo. 868, 102 S.W.2d 915, 921; Blanks v. St. Louis Public Service Co., Mo.App., 342 S.W.2d 272, 277; Dwinell v. Thompson, Mo., 243 S.W.2d 988, 991; or "timely warning," Engleman v. Railway Express Agency, 340 Mo. 360, 100 S.W.2d 540; or "reasonable warning," Matthews v. Mound City Cab Co., supra, 205 S.W. 2d loc. cit. 250.

sense in the light of existing circumstances. Richards v. Anderson, 9 Utah 2d 17, 337 P.2d 59. If defendant wanted a more definitive instruction he should have tendered it. McCallum v. Executive Aircraft Co., Mo. App., 291 S.W.2d 650, 657; Summers v. Tavern Rock Sand Co., Mo., 315 S.W.2d 201; Nelson v. Tayon, Mo., 265 S.W.2d 409, 415(4). We are not here called upon to pass upon the instruction had it *not* included the words, but we do say that defendant cannot complain of the insertion of the words because it placed an additional burden on plaintiffs. Palmer v. Lasswell, Mo.App., 267 S.W.2d 492, 496–497(8); Tinsley v. Massman Const. Co., Mo., 270 S.W.2d 835, 840(3); Henderson v. Dolas, Mo., 217 S.W. 2d 554, 557(6).

■ A further complaint against the first submission is that it does not hypothesize facts requiring a finding that defendant's brake light was not burning. The instruction followed the language of the statute [V.A.M.S. § 304.019(1)] by submitting the failure to extend the arm and then, wisely we think, added "or failed to give other timely and adequate warning of his intention to check the speed." As to the brake light (one possible other warning), it was not entirely a question of whether it was working; it was also a question of whether it was so placed, constructed, and operated as to be seeable and adequate, and whether, if so adequate, warning thereby was timely. Since the instruction did require a finding of failure to signal in the manner required by V.A.M.S. § 304.019(1), it was not necessary to hypothesize in detail the reason why adequate warning was not given by light or other means. In this respect the instruction is similar to that upheld in White v. Rohrer, Mo., 267 S.W.2d 31, 35. See also Knox v. Weathers, supra, 257 S.W.2d loc. cit. 917; Terrell v. McKnight, 360 Mo. 19, 226 S.W.2d 714.

■ Complaint is made of the second disjunctive submission "because it does not hypothesize facts that would be a guide as to *the particular manner* in which the Chevrolet would be impeded or blocked, nor how such speed would be an unsafe operation." Only one case is cited to this point, viz., Myers v. Buchanan, Mo., 333 S.W.2d 18. That case is not in point. It involved a contributory negligence instruction which imposed an absolute duty in the abstract without hypothesizing any facts whatsoever. The instruction here involved does hypothesize the location on the highway, the fact that the Chevrolet was following the truck, a finding that the collision was directly and proximately caused by defendant's negligence in driving at a speed of three to four miles per hour, a finding that such speed was such a slow speed as to block or impede normal and reasonable movement of traffic, et cetera. Defendant does not point out what essentials are lacking or explain why further hypothesization is necessary. The facts in this case are not complicated and there is very little divergence or dispute. The *manner* in which the Chevrolet was blocked or impeded was obvious. We think that under the circumstances the hypothesization covered all essential facts. See Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, 500; Shepard v. Harris, Mo., 329 S.W.2d 1, 7–8(10). If defendant thought they were not clear enough he should have offered an amplifying instruction. In that event perhaps we would have been advised what fact in particular he believes to have been essential but omitted. Had plaintiffs indulged in much further hypothesization they might have run the risk of making their instruction argumentative or a comment. Defendant's contention in this regard is without substantial merit.

It is also contended that plaintiffs' main instruction, No. 1, is erroneous in that it failed to refer to defendant's sole cause instruction, No. 7. To this appellant cites Moore v. Ready Mixed Concrete Co., Mo., 329 S.W.2d 14. That was a case which involved the *affirmative defense* of contributory negligence, which must be affirmatively pleaded. Shepard v. Harris, supra, 329 S.W.2d loc. cit. 6(3); Robinson v. Gaines, Mo., 331 S.W.2d 653, 655(5).

■ Sole cause is not an affirmative defense [Lynn v. Kern, Mo., 323 S.W.2d 726, 728(1)] but is simply a statement that the defendant was guilty of no negligence (by reason of the sole cause) and may be submitted under a general denial. Long v. Mild, 347 Mo. 1002, 149 S.W.2d 853, 857(3); Spicer v. Hannah, 241 Mo.App. 1215, 247 S.W.2d 864, 866(2). The plaintiff is not required to negative every defense theory offered by defendant [Papen v. Friedmeyer, Mo.App., 255 S.W.2d 841, 846(9)] and specifically is not required to negative the submitted defense of "sole cause." Payne v. Stott, Mo.App., 181 S.W.2d 161, 164.

■ Also assigned as error is the giving of plaintiffs' Instruction No. 6, which informed the jury that the negligence of Robert Goodale, the driver, could not be imputed to Judith and affect the rights of the plaintiffs "unless the negligence, if any, of Robert Goodale was the *sole cause* of the collision and death of Judith," and therefore even though they found Goodale was guilty of negligence, nevertheless if they found and believed defendant was also guilty of negligence as submitted in plaintiffs' Instruction 1 and that such negligence of defendant directly contributed to cause the collision and death, they could not find against plaintiffs on the ground that the driver of the Chevrolet was guilty of negligence.

Defendant says that the imputed negligence of the driver of the Chevrolet was not an issue; that contributory negligence was not an issue and this instruction injects that issue in the form of a comment; that it does not refer to defendant's sole cause instruction; and that plaintiffs already had instructed on sole cause (in their Instruction No. 8) and were entitled to only one instruction on the subject.

It is true that direct contributory negligence of Judith (such as, for instance, failure to warn) was not pleaded [Siemes v. Englehart, Mo.App., 346 S.W.2d 560, 566(8)], was not made an issue, and is not an issue here. The instruction we think

was a correct application of the law as applied to imputed negligence. LeNeve v. Rankin, Mo.App., 341 S.W.2d 358, 363; Setzer v. Ulrich, Mo.App., 90 S.W.2d 154. See also Hieber v. Thompson, Mo.App., 252 S.W.2d 116. Similar instructions will be found in Banker v. Wells, Mo.App., 274 S.W. 939, and Shutz v. Wells, Mo.App., 264 S.W. 479. See also Rodenkirch v. Nemnich, Mo.App., 168 S.W.2d 977, 980. Repetition of or elaboration on the same proposition of law in different instructions ordinarily is not ground for reversal or remand. See cases cited in 1 Raymond on Instructions, § 213, p. 188.

The final assignment is that damages of $15,000 (after remittitur) are excessive because "aggravating circumstances" were not shown or submitted. The expense of burial plus hospital and medical expenditures in a vain effort to save the life of the child was approximately $1,946.65. Judy was in junior high school, in excellent health, an above average student, a willing and conscientious worker, with some talent in art. She was well liked by her fellow students and took part in all school activities. At home she assisted her mother in the normal household duties and was particularly helpful in caring for a younger brother. The father farmed on a rather extensive scale, but largely on rented land, and also had a small trucking business. Commencing when Judy was about seven years old, her mother had a health problem, had surgery, was in the hospital three times in one year, and could do no work for one year. During those occasions Judy assumed greater responsibility, or, to quote her mother, "took over" certain duties. The mother is not yet (at time of trial) in good health. An older sister is married and gone.

■ As the courts interpret V.A.M.S. § 537.090, the measure of damages is, aside from "aggravating circumstances," the pecuniary loss suffered by the parents less the anticipated cost of rearing the child, during minority. Oliver v. Morgan, Mo., 73 S.W.2d 993, 997; Harrison v. St. Louis-

San Francisco R. Co., Mo.App., 291 S.W. 525, 527(4).

 Appellant argues that a distinction should be made between girls and boys in respect to possible earnings and value of services. This argument might be accepted in some countries, but we are not about to agree that in 1960 America a girl is worth less (or more), even economically, to her parents than a boy. That depends upon the individual and the circumstances, not the sex. And even assuming, without in anywise so holding, that a boy under twenty-one will earn more money, *and turn it over to the parents,* or that a boy is less expensive to rear, there is still the question of devoted services performed in the form of household duties, nursing, and a myriad of other things by which the parents might benefit. So long as the courts hold to the theory of "pecuniary loss," the amount of damages so awarded must necessarily be speculative. Who can say what financial benefit a thirteen-year-old child will or might be during the remaining years of minority? It is for the jury, not the appellate court, to fix the amount, circumscribed and limited only by the fact that the verdict must not be beyond the bounds of reason or such as to shock the conscience of the court. Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372; McCrary v. Ogden, Mo., 267 S.W.2d 670, 676–677; Shepard v. Harris, supra, 329 S.W.2d loc. cit. 13–14; Domijan v. Harp, Mo., 340 S.W.2d 728, 734. In this instance the jury determined the amount it deemed to be reasonable. The trial court fixed a smaller amount to which accession has been made by remittitur. We are not inclined to dispute the judgment of those who heard the evidence and saw the witnesses by saying that $15,000 is excessive.

The judgment is affirmed.

STONE, P. J., McDOWELL, J., and HUNTER, Special Judge, concur.

RUARK, J., not participating.