Everett Doyle COWAN, Jr., et ux.,
Plaintiffs-Appellants,

v.

Dennis Woodrow PERRYMAN,
Defendant-Respondent.

No. 14869.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 2, 1987.

Motion for Rehearing or Transfer
Denied Oct. 20, 1987.

Application to Transfer Denied
Dec. 15, 1987.

Bob J. Keeter, Wear, Keeter, Karchmer, Nelms, Kirby & Johnson, Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for plaintiffs-appellants.

David Donnelly, James E. Baldwin, G. Stanley Moore, Donnelly, Baldwin and Wilhite, Lebanon, for defendant-respondent.

FLANIGAN, Judge.

This personal injury action, brought by plaintiffs Everett Cowan, Jr. and his wife Carol Cowan against defendant Dennis Perryman, arose out of an automobile collision which occurred on Missouri Route J in Laclede County, involving a 1977 Dodge Colt operated by Cowan and a 1979 Mercury driven by defendant. The claim of Carol Cowan was based on her alleged loss of the services and consortium of Cowan.

The verdict of the jury, returned with respect to the claim of plaintiff Cowan, assessed percentages of fault as follows: "Defendant Dennis Perryman—75 percent; plaintiff Everett Doyle Cowan, Jr.—25 percent." The jury also found the total amount of Cowan's damages "disregarding any fault on the part of [Cowan]," to be $1,000. By separate verdict the jury found the total of plaintiff Carol Cowan's damages to be "$0." Pursuant to the verdicts, the trial court entered judgment awarding plaintiff Everett Cowan $750 on his claim and denied plaintiff Carol Cowan recovery on her claim. Plaintiffs appeal.

Plaintiffs' first point is that the trial court erred in submitting, at defendant's request, Instruction 9 which applied to the claim of Cowan. Instruction 9, based on MAI 17.12 and MAI 37.02 [1986 New], reads:

"INSTRUCTION NO. 9

In your verdict you must assess a percentage of fault to plaintiff if you believe:

First, plaintiff suddenly stopped his automobile on the highway without first giving adequate and timely warning of his intention to stop, and

Second, plaintiff was thereby negligent, and

Third, such negligence of plaintiff directly caused or directly contributed to

cause any damage plaintiff may have sustained."

Plaintiffs contend that Instruction 9 "was not supported by substantial evidence in that the record contains no evidence that Cowan stopped his automobile 'suddenly' or that his failure to signal directly caused or contributed to cause any of the ensuing damage."

█ It is error to give an instruction where there is no substantial evidence to support the issues submitted. *Brassfield v. Sears*, 421 S.W.2d 321, 323 (Mo.1967); *Buus v. Stocker Oil Co.*, 625 S.W.2d 236, 237[1] (Mo.App.1981). Defendant, as the party offering Instruction 9, had the burden of showing a causal connection between the alleged negligent conduct of Cowan and the injuries sustained. *Lewis v. State Sec. Ins. Co.*, 718 S.W.2d 539, 541[2] (Mo.App.1986); *Bunch v. McMillian*, 568 S.W.2d 809, 811 (Mo.App.1978). If the evidence presented "leaves the causal connection in the nebulous twilight of speculation, conjecture and surmise," the burden is not met and the instruction should not have been given. *Id.*

█ Missouri has adopted comparative negligence by court decision. Comparative negligence has no application where the negligence of one party is the sole proximate cause of an accident and the other party is not guilty of negligence. *Finninger v. Johnson*, 692 S.W.2d 390, 393 (Mo.App.1985). To determine whether Instruction 9 was supported by substantial evidence this court must view the evidence and inferences in the light most favorable to defendant and disregard all contrary evidence and inferences. *Allen v. Perry*, 722 S.W.2d 98, 100 (Mo.App.1986). Defendant is entitled to the benefit of plaintiffs' evidence favorable to defendant and not contradicted by defendant's evidence or defendant's theory of the case. *Certa v. Associated Bldg. Center, Inc.*, 560 S.W.2d 593, 597[8] (Mo.App.1977).

█ Section 304.019 [1] reads, in pertinent part:

1. All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

"No person shall stop or suddenly decrease the speed of or turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided herein.

(1) An operator or driver when stopping, or when checking the speed of his vehicle, if the movement of other vehicles may reasonably be affected by such checking of speed, shall extend his arm at an angle below horizontal so that the same may be seen in the rear of his vehicle;

.  .  .  .  .

(4) The signals herein required shall be given either by means of the hand and arm or by a signal light or signal device in good mechanical condition of a type approved by the state highway patrol. . . ."

The collision occurred at approximately 2:00 p.m. on June 30, 1983, a clear day. Immediately prior to the collision three vehicles were proceeding west on Route J, an asphalt two-lane state highway. The lead vehicle was driven by a Mrs. Bohannon, the second vehicle was the Dodge operated by Cowan, and the third vehicle was the Mercury operated by defendant. The posted speed limit was 35 miles per hour.

Plaintiff Cowan testified that he left the parking lot of a bank located about .2 of a mile east of the accident scene and proceeded west on Route J at a speed of 25 to 30. Cowan testified: "There was a car in front of me with a left turn signal on. I started slowing down until I got right behind her [the Bohannon car] and I stopped. I came to a complete stop. Mrs. Bohannon could not make a left hand turn [into a driveway] because there was a vehicle coming from the other direction. As I was slowing to stop behind her, I saw, in my rear-view mirror, a red Mercury coming up from behind me. I couldn't tell what [Perryman's] speed was. It was coming fast. The Perryman car was back somewhere in the neighborhood of the bank, just this side of it, when I first saw it. I came to a stop

behind the Bohannon car, almost to a stop, at about a 10–foot distance. I rolled up a little closer like within six feet and when I did I looked back up in the mirror. By this time the Perryman car was close enough that I could detect pretty much what speed he was going and he was going 50. It looked like I was going to be hit so I started to shove the car in gear and turn my wheels. I was going to try to go around the lady. I did not take my foot off the brake before Perryman hit me. I did not move any before Perryman struck me. The Perryman car hit the rear end of my car and damaged the trunk area and back end. I don't remember whether it broke out the right tail light but there was more damage to the right side than to the left. The impact slung me backward and it broke off the back of my seat and then it knocked me into the Bohannon car and threw me forward and broke a mirror off and I hit the windshield and cracked and knocked the top out of it."

On cross-examination Cowan testified that he could not recall the distance the Mercury was behind him the second time he looked. Cowan said: "I don't know whether or not my brake lights or tail lights were working at the time. I did not give an arm signal to indicate I was slowing or stopping."

Highway patrolman Larry Henson, a witness for the plaintiffs, investigated the accident. He testified that he saw skidmarks left by sliding tires. They were all in the westbound lane and they led up to Cowan's car. They were 22 or 24 feet long. "I determined that Perryman's car made those skidmarks." He said the damage to the front end of the Cowan car was "very minor" and that he did not check the lights on the Cowan car. There was damage to the rear of the Cowan car, the trunk area and the bumper. He estimated the speed of the Perryman vehicle at 30 miles per hour.

Testifying in his own behalf, defendant Perryman said that he was driving his Mercury Marquis west on Highway J behind the Cowan car. Larry Dill was riding with him. Perryman said that he stopped at the

intersection of "CC and J" where the bank is located and turned left and proceeded west on Route J. The accident occurred about .2 of a mile west of the intersection of CC and J.

Perryman said, "As I went that .2 of a mile I was following about 100 feet behind Cowan's car, 100 feet between the front of my car and the rear of the Cowan car. As I was following the Cowan car, going 30 miles an hour, the next thing I noticed was that Cowan stopped or nearly stopped without any signal. Cowan was approximately 60 feet in front of me when he stopped or nearly stopped without any signal.

"When I noticed Cowan stopped or nearly stopped on the highway, I immediately applied my brakes and swerved to the right. My wheels locked up and slid. I left some tire marks on the pavement because of that. I then slid into the back of Cowan's car. Cowan had not given a hand signal before he stopped. I was able to slow down before the impact. At the time of the impact my speed was around 15. I was able to apply my brakes immediately when I noticed Cowan sitting there. The impact moved the Cowan car two to two and one-half feet.

"After the collision Cowan's car was still on the highway with one wheel off the highway. My car ended up still on the highway in the right hand lane. I was looking ahead. I never took my eyes off the road as I was going from the intersection of CC down to where the accident happened. At the time I saw Cowan stopped on the pavement, traffic was coming toward me and I could not veer to the left because of that traffic. On the right hand side was a ditch. I had the Cowan car in view at all times.

"The trooper gave me a ticket for following too close and I paid it. I told Trooper Henson about the brake lights not showing up on Cowan's car. The front end of my car was damaged, the parking lights were knocked out on the right hand side and there was minor damage to the grill and hood. The right fender was pushed back a little. The rear end of Cowan's car was crushed in and the tail lights were broken."

On cross-examination, Perryman testified: "As I traveled on J, at all times I was able to see the Cowan car as I drove west and I kept my eyes on him continuously. I was watching its tail lights. I was about 60 feet away when I observed the Cowan car slowing. It is about .2 of a mile or 1,056 feet from the intersection of CC to where the accident happened. I was 60 feet away when I realized Cowan was slowing. I did not observe any slowing on the part of Cowan during the other 1,000 feet. A car going 30 miles an hour travels 44 feet a second. In the 60 feet I had to stop I had only a little over a second to stop. I took action whenever I realized Cowan was stopped or nearly stopped. Cowan never showed no signal of any kind. I was watching him but there were no brake lights or hand signals. I did not see Mrs. Bohannon in front of Cowan and did not see Bohannon's left turn signal."

Larry Dill, a plaintiffs' witness, testified that, as a passenger in the Perryman car, he was leaning over tying his shoes. Dill said, "While my head was down I felt a slowing of the car. After I got my shoes tied I raised up and then we hit. I saw the back of the Cowan car when I raised up. I did not see brake lights or hand signal. When I raised up, Cowan's car was 20 feet away. Perryman was not going over 30. Perryman hit his brakes before I looked up. When I looked up and saw the rear of the Cowan car it was in its proper lane of traffic and it looked like it was barely going forward."

The foregoing testimony entitled the jury to find that prior to the Dodge-Mercury impact the Dodge and the Mercury were both proceeding west, each at a speed of 30 miles per hour and with an interval of approximately 100 feet between them. Cowan brought the Dodge to a complete stop in the traveled portion of the roadway. Cowan admitted that he gave no "arm signal to indicate I was slowing or stopping" and he did not know whether or not his "brake lights or tail lights were working at the time."

Perryman testified that "I never took my eyes off the road" as he was following the

Dodge, that the Dodge "stopped or nearly stopped without any signal," and that the Dodge was "approximately 60 feet in front of me when he stopped or nearly stopped without any signal." He said he had the Dodge "in view at all times." Perryman further testified that he, Perryman, immediately applied his brakes and reduced his speed to 15 miles per hour before colliding with the rear of the Dodge. There was evidence that the Mercury laid down skidmarks 24 feet long.

Plaintiffs make no claim that the evidence was insufficient to support those portions of Instruction 9 which required the jury to find that Cowan "stopped his automobile on the highway without first giving adequate and timely warning of his intention to stop." Plaintiffs assert there was no evidence that Cowan stopped his car "suddenly" or that Cowan's failure to signal had a causal connection with Cowan's damage.

Plaintiffs' brief says: "[Perryman's] evidence established that he was, prior to the collision, following [Cowan] at a distance of at least one hundred feet. Notwithstanding the absence of any signal, [Perryman] manifestly could see [Cowan's] vehicle, and had he been properly observant, could have stopped his vehicle within that distance prior to the collision." Plaintiffs argue that "a driver traveling at thirty miles per hour can apply brakes and stop within a much shorter distance than one hundred feet" and that "this court must take judicial notice of it."

The evidence justified the jury in finding that Cowan stopped the Dodge on the highway and that he did so, in the language of Instruction 9, "without first giving adequate and timely warning of his intention to stop." There was evidence that he gave no warning at all. The opening paragraph of § 304.019 proscribes an unsignalled stopping on a roadway, whether it be sudden or not. It also proscribes an unsignalled sudden decrease in the speed of a vehicle on a roadway. Of course, if a stop is sudden, it is also a sudden decrease.

Instruction 9 and MAI 17.12, unlike the statute, include the word "suddenly" with respect to a stop of the type described. In a case dealing with § 304.019 this court said, "[A]ny stopping which blocks the path of a following vehicle, in a situation which calls for a warning signal, is 'sudden' if made without timely and adequate warning." *Lafferty v. Wattle*, 349 S.W.2d 519, 525 (Mo.App.1961).

In *Lafferty* the court also said, at p. 526:

"[T]he speeds and distances were the products of estimates made after the event and under conditions not conducive to yardstick accuracy. Under such conditions the parties are not held to fine measurements and degrees. They are to be treated as approximations, not as absolutes ... and the jury is entitled to take the *whole circumstances*, correlate the facts and, if such reasonably can be done from the evidence, arrive at a conclusion which may not exactly fit any of the estimates.

... The jury could well have found that the driver of the Chevrolet had much less than 240 feet in which to discover and react to defendant's decrease in speed. There are too many relative factors involved in this situation to fix precisely as a matter of law any certain distance in which the checking of speed would or would not have reasonably affected the movement of the car in which deceased was riding. That was a question for the jury under all of the circumstances shown by the evidence and the reasonable inferences which might have been drawn therefrom." (Emphasis in original—citing authorities.)

In *Ochs v. Wilson*, 427 S.W.2d 748, 752 (Mo.App.1968), the court said:

"Automobiles are so commonly and universally used that knowledge and information concerning their operation is widely known.... For that reason our courts have frequently taken judicial notice that an automobile traveling at a given speed may be stopped within certain limits ... and have likewise taken judicial notice that a motor vehicle traveling at a certain speed cannot be stopped within a stated number of feet." (Citing authorities.)

In *Rosson v. Oberkrom,* 690 S.W.2d 181, 183 (Mo.App.1985), the court referred to a table in Blashfield, Automobile Law and Practice, 3d Ed., Vol. 1, § 3.3, p. 38, showing variances in braking distances, not including reaction time, shown by various highway patrol drivers' manuals. The actual braking distance of a car traveling 30 miles per hour, exclusive of reaction time, ranges, according to the table, from 42 feet to 76 feet. If a driver's reaction time is measured at 3/4 of a second, at 30 miles per hour a vehicle travels 33 feet while the driver is reacting. Accordingly the overall stopping distance of a vehicle traveling 30 miles per hour may vary from 75 to 109 feet. According to the Blashfield table, the Missouri Highway Patrol Drivers' Manual shows, for a speed of 30, a braking distance of 48 feet which, together with a reaction time of 33 feet, gives an overall stopping distance of 81 feet.

The evidence would support a finding that so long as Perryman maintained an interval of 100 feet between the Mercury and the Dodge, he had adequate room in which to stop. The jury could also find that the interval was reduced to 60 feet when Perryman, although watching the Dodge, first observed that it was "stopped or nearly stopped without any signal." Perryman then applied his brakes but could not stop before colliding with the Dodge. The attempted stop of Perryman, so the jury could find, was a sudden one. The jury could also find under all the circumstances, including the fact that the Dodge was at a complete stop at least by the time of the Dodge-Mercury impact, that Cowan's stopping of the Dodge was a sudden one.

The jury could also have found that if Cowan had "first given adequate and timely warning of his intention to stop," as required by Instruction 9, before proceeding to stop, Perryman could have seen that warning in time to have stopped before striking the Dodge. In view of Perryman's overall stopping distance, coupled with the permissible finding that the interval between the Dodge and the Mercury was 100 feet prior to the stopping of the Dodge, the situation was one, so the jury could find, where the movement of the Mercury could "reasonably be affected," § 304.019(1), by the stopping of the Dodge or the checking of its speed.

Although the third paragraph of Instruction 9 requires the finding that Cowan's negligence "directly caused *or* directly contributed to cause any damage [Cowan] may have sustained," the jury based its verdict on the "directly contributed to cause" language because it assessed only 25 percent of the fault to Cowan and 75 percent to Perryman. The evidence was sufficient to support that assessment.

This court holds that there was substantial evidence to support the giving of Instruction 9. *Rosson v. Oberkrom,* supra; *Schoessel v. Robertson,* 480 S.W.2d 95 (Mo. App.1972); *Lafferty v. Wattle,* supra. Plaintiff's first point has no merit.

Plaintiffs' second point is that the trial court erred in sustaining defendant's objection to the testimony of plaintiffs' witness Dr. George Carson "to the effect that the witness' diagnosis of [plaintiff Everett Cowan] was consistent with [his] complaints of headaches because said testimony was proper and admissible in that Dr. Carson was shown to be competent and qualified to so testify."

Plaintiffs' second point is based on the following incident which took place during direct examination of Dr. George Carson, a chiropractor.

"Q. And do you think that the diagnosis that you made would be consistent that this would cause him to report that he has pressure—a frontal type headache upon a daily basis?

A. Yes.

[DEFENSE COUNSEL]: I object to that, this witness is not qualified to state that.

THE COURT: Sustained."

Rule 84.04(c), V.A.M.R., provides, in pertinent part: "The statement of facts [portion of appellant's brief] shall be a fair and concise statement of the facts relevant to the questions presented for determination without argument...." The statement of facts portion of the brief of plain-

tiffs, as appellants, makes no mention of the foregoing trial incident nor does it set forth any portion of that incident. It is true that the argument portion of plaintiffs' brief contains a paraphrased version of the incident, but that falls short of a compliance with Rule 84.04(c). Plaintiffs' second point has not been preserved for appellate review and this court will limit its review of this point to determining whether plain error, Rule 84.13(c), appears.

■ A careful examination of the quoted portion of plaintiffs' second point shows that it contains a charitable construction of the question which was actually posed to Dr. Carson. The question itself was awkwardly worded and included the phrase "this would cause him to report" and to do so "on a daily basis." The wording of the question is such that the antecedent of the word "this" is unclear. Arguably its antecedent was Dr. Carson's diagnosis. The question posed to Dr. Carson was not phrased with the specificity which plaintiffs' second point seeks to accord it. It should be noted also that the question was in fact answered by the witness and defense counsel, whose objection was made only after the question was answered, made no motion to strike the answer. This court concludes that no plain error appears. Plaintiffs' second point has no merit.

■ Plaintiffs' third point is that the trial court erred "in excluding testimony of Timothy Cowan regarding [plaintiff Everett Cowan's] complaints of pain because such testimony was competent and admissible in that it was not hearsay and was independently admissible as declarations of existing physical and mental condition."

Plaintiffs' third point is based on the following incident which took place during direct examination of plaintiffs' witness Timothy Cowan by plaintiffs' attorney Keeter.

"Q. Now, prior to that June of '83 accident, as you worked with Everett, what complaints did you hear him make about hurting?

A. Uh, just—

[DEFENSE COUNSEL]: I object to that, your Honor—hearsay.

THE COURT: Sustained.

Q. MR. KEETER: I am asking for present complaints of pain, your Honor.

THE COURT: Objection sustained.

Q. MR. KEETER: Did you ever hear Everett say his head hurt?

[DEFENSE COUNSEL]: Objection—the same thing.

THE COURT: Sustained."

Recess was then taken and the following took place outside the hearing of the jury:

"THE COURT: Mr. Keeter—

MR. KEETER: *I offer to prove by this witness as to the complaints of pain that this witness heard Everett Cowan, the plaintiff, make before the accident. And the complaint of pain presently existing—complaints of pain that he made after the accident. I also will have him testify as to his physical condition, the work that he was able to do and that he was not able to do before the accident.* And it is my understanding that it has always been the rule that either a doctor or a lay person can testify as to present existing complaints of pain at the time that they were made. It is a well recognized exception to the hearsay rule."

Defense counsel renewed his hearsay objection and added another objection.

The following then occurred:

"THE COURT: I ruled upon an objection that was made. We have gone far afield from that. The ruling upon the objection that was made stands. I think that you are—what you have characterized as an offer of proof goes far beyond what I understood to be before me. I am not prepared to accept that offer of proof. I deny that at this time and simply tell you I will rule upon the evidence as it is presented subject to the objections made. At this time the objection that was sustained—remains sustained."

In *Karashin v. Haggard Hauling and Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983), the court said:

"An offer of proof must demonstrate the relevancy of the testimony offered,

must be specific, and must be definite. *State v. Sullivan*, 553 S.W.2d 510, 513 (Mo.App.1977); *State v. Davis*, 515 S.W. 2d 773, 775 (Mo.App.1974). In order to present and preserve an offer of proof *the questions must be propounded to a witness* who is present and has taken the stand. This enables the trial court to rule upon the propriety and admissibility of the evidence, and preserves a record for appellate review. *Sullivan*, 553 S.W. 2d at 513." (Emphasis added.)

A limited exception to the *Karashin* rule is discussed in *Frank v. Environmental Sanitation Management*, 687 S.W.2d 876, 883 (Mo. banc 1985), but the case at bar does not fall within the exception.

In *State v. Sullivan*, 553 S.W.2d 510, 513 (Mo.App.1977), cited with approval in *Karashin*, supra, the court said:

> "Further, such offer 'must show all of the facts necessary to establish the admissibility of the testimony sought to be introduced' and it must be 'specific and definite' and '*not a mere statement of the conclusions of counsel.*' *Kinzel v. West Park Investment Corporation*, 330 S.W.2d 792, 795–796[1, 4] (Mo.1959)." (Emphasis added.)

It should be observed that the witness, Timothy Cowan, did not state what his answer would have been to the questions which were posed to him. During the hearing outside the presence of the jury, counsel made no effort to elicit that information from Timothy himself. Even if Mr. Keeter's statement, as distinguished from a statement elicited from Timothy himself, were to be considered, arguendo, as an offer of proof, it is not "specific and definite" and is nothing more than "a mere statement of the conclusions of counsel." Mr. Keeter did not state specifically what Timothy Cowan's testimony would have been if the witness had been permitted to answer the questions posed to him, nor did he state the specific content of any of the testimony which Timothy could provide.

The remark by Mr. Keeter—"I also will have him testify as to his physical condition the work that he was able to do and that he was not able to do before the accident"—

did not involve the subject matter of the questions propounded to the witness and, as the trial court pointed out, went "beyond" the issue then under consideration. Mr. Keeter, moreover, did not state with specificity what testimony the witness would provide with respect to the additional matters. The inadequacy of plaintiffs' offer of proof is fatal to plaintiffs' third point.

■ Plaintiffs' fourth point is that the trial court erred in overruling *"appellant's"* motion for new trial "because the verdict of the jury was inadequate in that said verdict was so grossly and shockingly deficient as to signify passion and prejudice on the part of the jury." Throughout the argument under their fourth point, plaintiffs mention only the $1,000 verdict in favor of plaintiff Everett Cowan. They make no complaint concerning the separate verdict in which the jury found plaintiff Carol Cowan's damages to be "$0." Accordingly, this court's review need not, and will not, deal with the propriety of the latter verdict.

In *Homeyer v. Wyandotte Chemical Corp.*, 421 S.W.2d 306, 309 (Mo.1967), the court said:

> "Since the jury at the trial and the trial judge in overruling the motion for new trial have passed on the credibility of the witnesses and the weight of the evidence, the appellate court in reviewing the adequacy of the damage award must view the evidence in the light most favorable to the verdict.... Where the verdict has the approval of the trial court, it is conclusive on appeal unless it is so shocking and grossly inadequate as to indicate that the amount of the verdict was due to passion and prejudice." (Citing authorities.)

The trial court has wide discretion in ruling on a motion for a new trial which claims the verdict is inadequate because that court may take into consideration the credibility of the witnesses and may weigh the evidence. When, as here, the trial court has denied such a motion, appellate review is limited to consideration of the evidence which supports the trial court's

action. *Summers v. Fuller*, 729 S.W.2d 32, 33 (Mo.App.1987).

The collision occurred on June 30, 1983. Prior to that date plaintiff Everett Cowan had a series of misfortunes which require discussion. Cowan, who was 39 at the time of trial, sold "Bible story books" until he went into carpentry work in 1969.

In 1975 he was involved in a collision. His pickup truck was rear-ended by a Lincoln Continental and he received medical treatment from Ben Kozikowski, M.D., an orthopedic surgeon. He had surgery in the low back and was off work a year.

In June 1978 he was in a Walmart store when a stack of 15 lawn mowers "toppled over my head and shoulder and back." This necessitated additional treatment from Dr. Kozikowski for neck and low back complaints.

In January 1979 Cowan "had a crushed vertebrae in my neck and they took a bone out of my hip and put it in between where the vertebrae was and welded it together. I had trouble with my back and bowel movements."

In 1980 he had surgery "around the same area where I had the herniated disc. My doctor recommended that I change my occupation. He told me to wear a back brace when I was doing heavy work. I tried to do more supervisory work and let the crews do the framing and heavy work."

In May 1980, while Cowan was cleaning out his garage, "a ladder was hanging on the wall. The ladder kind of rolled over and one end hit me on the shoulder and the other end hit the floor. That caused me to have cramps in the back and shoulders."

In June 1981 Cowan fell "at the City Utilities" in Springfield. "When I got to the marble floor both feet went straight up and I landed on my back and shoulders causing me trouble in the shoulder blades and the base of my neck. Dr. Kozikowski recommended back massage and heat and I went to the hospital for a myelogram. My back continued to cramp in the middle of my back and shoulders and I had cramping in my right arm."

In 1982 he had a peptic ulcer while running for the state legislature. "Shortly after the November election I considered opening a business with my brother and brother-in-law. While campaigning I had cramping and aching in the back of my neck."

In early 1983, according to Cowan, "we were putting up poles in a pole barn. The forklift broke while I was helping a guy move some poles. This caused me physical problems and I went to Dr. Kozikowski on April 26, 1983, with cramping between the shoulder blades and the back of my neck. Ever since my surgery in 1980 Dr. Kozikowski recommended that I change my occupation. I got into a different business and opened a lumber yard on August 1, 1983.

"I saw Dr. Kozikowski for treatment in 1975, 1976, 1977, 1979, 1980, 1981, 1982, and once in 1983 before this accident.

"On June 30, 1983, the collision occurred when the Perryman car hit the rear end of my car. It damaged the trunk area and back end. There was more damage to the right side than to the left but I don't remember whether it broke out the right tail light."

On the day of the Perryman–Cowan collision Cowan was taken to St. John's Hospital in Springfield where he stayed overnight. The next morning he and his wife went to Holly, Michigan, on vacation. "My wife and I had planned a vacation and we continued on our vacation."

On September 14, 1983, Cowan saw Dr. Kozikowski who recommended a muscle relaxant and physical therapy.

After the Perryman–Cowan collision Cowan, so he testified, "continued in the lumber yard until 1985. Once in a while I would help unload some 2 x 4s or saw something for somebody." Cowan said he got out of the lumber business for two reasons—"all the back and pain and injury and, second, business was slow and it would not support three families." Cowan also said that he had had migraine headaches since he was 12 years old.

As a result of the 1975 rear-end accident in Tennessee and the 1978 Walmart accident in Springfield, Cowan made "claims" and settled them. He filed a lawsuit against Walmart. On cross-examination by defense counsel Cowan testified:

"Q. Would it be fair to say Mr. Cowan, that you have been suffering from neck and back pain and headaches throughout the period of from 1975 on down to the date of this accident upon June 30, 1983?

A. Now throughout—periodically.

Q. ·All right—upon the occasions of these accidents and injuries and treatments and operations, would it be true that throughout this period of time that you experienced pain in the neck and head and the back?

A. Yes, sir.

· Q. And you are still experiencing pain in the head and neck and back?

A. Yes, sir, I am—and the arms."

Dr. Kozikowski, who testified as a plaintiffs' witness, examined Cowan on November 7, 1984. At that time Cowan stated that he had been "quite active over the past 14 months ... was doing much walking, works in a lumber yard and campaigning for an elective post." Dr. Kozikowski's findings on that date included "minimal ability to rotate head to left; slight discomfort in low and middle neck."

Significantly Dr. Kozikowski also said that on April 6, 1983, several weeks prior to the Perryman-Cowan collision, "Cowan asked me to rate him as being totally disabled at that time. Apparently Cowan felt he was totally disabled at that time. I advised him I could not state he was totally disabled but he might benefit from job retraining for activity which does not require a great deal of repetitive bending or lifting." Dr. Kozikowski also said that the injuries Cowan received in connection with the June 30, 1983 accident were "soft tissue injuries."

C. Norman Shealy, M.D., a plaintiffs' witness, said that Cowan's injury "was a soft tissue injury, no evidence of bony injury." Mrs. Cowan admitted that "before and after the [June 30, 1983] accident [Cowan] had pain in the head and neck and back."

Frank Sundstrom, M.D., an orthopedist who examined Cowan on October 9, 1985 on behalf of the defendant, testified that Cowan's complaints of pain and popping in the base of the neck were "subjective" and Dr. Sundstrom "found no evidence to substantiate those subjective complaints." Dr. Sundstrom "found no condition that related to the accident of June 30, 1983." Dr. Sundstrom attributed Cowan's complaints to physical problems preceding the June 30, 1983 accident.

Although there was evidence that Cowan incurred substantial medical expenses between the date of the Perryman–Cowan collision and the trial, the jury may have concluded that most of those expenses were not related to the Perryman–Cowan collision.

This court concludes that the $1,000 verdict is not "so shocking and grossly inadequate as to indicate that [it] was due to passion and prejudice." *Homeyer,* supra. Plaintiffs' fourth point has no merit.

The judgment is affirmed.

PREWITT, P.J., and HOGAN and MAUS, JJ., concur.