CHARLES G. PAISLEY v. KANSAS CITY PUBLIC SERVICE COMPANY, Appellant.—No. 38471.—173 S. W. (2d) 33.

Division One, July 6, 1943.

Rehearing Denied, July 20, 1943.

*Charles L. Carr* and *Harding, Murphy & Tucker* for appellant.

*R. H. Musser* and *Clyde J. Linde* for respondent.

470

■ BRADLEY, C.—Plaintiff sued to recover $12,150 for personal injuries to himself, loss of service of his wife, and damage to his automobile. The jury returned a verdict for defendant; the court granted a new trial and defendant appealed.

About 7:45 A. M., November 22, 1939, plaintiff and his wife, in plaintiff's automobile and plaintiff driving, were traveling north on Spruce street in Kansas City, Missouri, and the automobile was struck by defendant's eastbound street car at the intersection of Spruce and 24th street, resulting in the injuries complained of.

The grounds of negligence submitted were (1) operation of the street car at a high and excessive rate of speed under the existing conditions; (2) failure to keep a proper lookout for automobiles; (3) failure to keep the street car under proper control; and (4) failure to sound a warning of the approach of the street car. These grounds were submitted in the conjunctive.

The answer was a general denial and a plea of contributory negligence. It was charged that plaintiff was negligent (1) in failing to keep a lookout; (2) failure to look and listen for the approaching street car; (3) failure to yield the right of way over the intersection, alleged to have been required by an ordinance; (4) operating the automobile at a high and excessive rate of speed; and (5) failure to exercise the highest degree of care.

The trial court granted the new trial on the ground that it was error to give defendant's instruction D, which follows:

"The court instructs the jury that plaintiff is chargeable under the law with the duty to exercise the highest degree of care for his own safety. You are further instructed that if you find that plaintiff

failed to exercise the highest degree of care for his own safety, if so, and that such failure directly and solely caused said collision, if so, or if you find that said failure, if any, to exercise the highest degree of care for his own safety directly contributed to the cause of said collision, if so, then in either such event plaintiff's failure to exercise the highest degree of care for his own safety, if so, bars his right to a recovery and your verdict in such event, if you so find, should be for defendant.''

Defendant says (1) that plaintiff failed to make a submissible case and that therefore, error in instruction D, if any, is not of consequence; (2) that if there is error in instruction D because it is too general and gave to the jury a roving commission, ''plaintiff invited it by giving the same commission''; and (3) that, when all the instructions are considered together, there is no prejudicial error in instruction D.

Did plaintiff make a submissible case? Plaintiff, at the time (November 22, 1939) was sheriff of Clinton County, Missouri. He had been over in Kansas on official business; his wife went along and they remained over in Kansas City on the night of November 21st, at the home of plaintiff's sister. The sister's home was 2628 Spruce street, about a block and a half south of the intersection where the collision occurred. On the early morning of Novembr 22nd, [35] there was a heavy fog. Plaintiff and his wife went north from his sister's home on Spruce, and the collision occurred very shortly thereafter. Spruce street, from curb to curb at the intersection, was 26 feet in width, and 24th street, from curb to curb, was 34 feet in width.

Plaintiff testified that there was a heavy fog; that he was driving a six months old Buick Special four-door sedan; that the windshield wiper was going; that the type of windshield he had gave good vision on the sides and in front, and that the left front window was down a couple of inches, ''enough to let the normal sounds come in''; that his headlights were on; that he was driving 10, 12, or 15 miles per hour and about 2½ or 3 feet from the east curb on Spruce, and was watching closely; that he could see 10 feet west of the light pole ''which shows on that picture''. The pole was at the southwest corner of the intersection and west of the sidewalk, but how far west of the sidewalk is not shown.

Plaintiff further testified that he was familiar with the intersection; that at the intersection, and for some distance west the street car tracks are on a down grade to the east; that he knew that street cars ran on 24th street; that, as he approached, he looked both east and west and listened; that his eyes and hearing were good, but that he did not see the street car; did not hear it; did not hear any gong. ''Q. Was there any gong rung or sounded? A. No, sir; if I had heard anything I would have stopped''; that ''when I got my car in the

intersection, or across the street car track (when struck the front wheels of the automobile were north of the south street car track and the rear wheels south of the track), all at once an object took me in the side, like that (indicating); that is when I saw the street car; the street car came out of that fog like nobody's business." The "like nobody's business" was stricken. Plaintiff said that his automobile was "shoved down the street car track about 20 or 25 feet", and that when the street car stopped "there was a light on it"; that "the motorman came around", and he said to the motorman, "What was you doing—making out your report, or where were you looking?" and that the motorman said, "I didn't see you."

Plaintiff further testified: "Q. Do you have any judgment as to the speed of the street car? A. No; . . . the only way I had to judge the speed he was driving was by the lick he gave me and the damage done to my car, and the distance it shoved me with that heavier car. Q. What he did was to hit you on one side of your car? A. Yes, hit me between the fenders, just touched the rear fender and the front one, and hit me square in the left side, as I was going north, on the driver's side, and it caved the left side of the car."

Mrs. Bessie Paisley, plaintiff's wife, testified that "there was a fog in spots. Q. Tell the jury whether or not there was anything that obscured or clouded your vision. A. There was some light fog, was all. Q. How is that? A. A light fog. Q. A light fog? A. In places, and heavy in places. Q. The fog was settled in the low places? A. I presume that was it. I don't know. Q. It was slowly rising as the sun got up? A. Yes, sir, it was all clear in a few minutes. Q. About eight o'clock it got fairly well cleared? A. Yes, sir."

Mrs. Paisley sat in the same seat and to the right of plaintiff; she said that she saw some children "on my side of the street at the crossing"; that she was watching on her side; that she had heard street cars operated on steel rails. "Q. Tell the jury whether or not there was any fog in the center. A. Yes, sir, there was fog there. Q. Tell the jury whether it was so heavy that it obscured all these (indicating)? A. No. Q. In other words, a car coming down there with headlights would have flashed through that cloud or whatever it was? A. Why, certainly. Q. Tell the jury whether or not you heard the rattling of any car. A. No, I didn't . . . Q. Tell the jury whether at the time that you remember that a street car came and ran into your husband's automobile. A. Of course I didn't know it was a street car. Q. Until you got out of that car? A. Yes, just before I got out of the car, I could look up, after the car had stopped, to see what had struck us." [36] Mrs. Paisley said that the street car pushed the automobile about 20 feet east.

Robert Handley Groves was operating the street car upon which there were no passengers. As a witness for defendant, Groves testified that the fog over the crossing, and for a block west "was very

dense", and that the range of vision was "about ten feet"; that visibility in front of the street car was about 10 feet; that the street car had steel wheels; was not the "noiseless type of street car"; that as he approached the crossing the power was not on; that he was coasting down the grade, and was traveling about 7 miles per hour. "Q. I assume that you call that coasting, don't you, when the car is rolling and no power is applied? A. Yes, sir. Q. And is the only way of controlling the speed of a street car, when coasting, by fanning the brakes a little, apply them? A. Yes, sir. Q. Is that what you were doing? A. Yes, that is what I was doing"; that the headlight was on; that the gong was foot operated. "Q. Within that block (immediately west), particularly, did you stomp the gong regularly, as you traveled it? A. All the way. Q. Was that quite continuous, or at intervals? A. Constantly. Q. Without intervals? Was your gong on that street car a loud gong? A. Yes, it was. Q. Was it one that a normally good ear could hear within the range of, say a block? A. Yes, it was."

Groves further testified that, as he approached the crossing, he. looked both to the north and south; that when he entered the intersection he did not see any vehicle approaching; and that "there was no other vehicle" therein; that he had proceeded into the intersection about 5 feet when plaintiff's automobile entered the intersection at "about 12 or 15 miles per hour"; that plaintiff did not swerve "in any direction", but continued "straight north"; that when the automobile "entered upon the track" the street car was on, it (the automobile) was "about 2 or 3 feet in front of the street car. . . . Q. Did he at any time slacken his speed from the time he entered the intersection, and clear up to the time he dashed directly in front of your street car, two or three feet from it? A. Not that I could see. Q. Did you continue all the time the sounding of the gong? A. Yes, sir, I did. Q. When you saw this automobile coming into the intersection, at 12 or 15 miles per hour, and at a time when your street car was already at least five feet in the intersection, what, if anything, did you do relative to the application of the brakes on your street car? A. I threw the car into emergency. . . . Q. How far did you travel after you first saw Mr. Paisley's car? A. About ten feet. Q. How far did you travel before you came to a complete stop? A. From the time I first saw his car—about 15 feet."

J. C. McGlynn, a policeman at the time of the collision, and employed as a street car operator by defendant at the time of the trial, was a witness for defendant. He testified that he was at about Jackson street, east (distance not shown) of the intersection when he heard the street car, and was driving west on 24th street, following the street car tracks; that it was foggy; that he "heard a street car coming, but I didn't know where it was; that he had the left window of his car rolled down and had his "head hanging out the window";

that visibility was not over 10 or 15 feet; that he heard a noise, pulled up and parked on the north side of 24th street "and saw a street car. Q. What did you see then? A. I could see lights, a headlight, and I was probably within ten feet of it before I could actually really see it to tell what it was; and I saw an automobile, and the street car was headed east and the automobile headed north. Q. Were there any lights burning on the automobile? A. Yes. Q. Will you describe them to the court and jury? A. The lights were on but dim when I got there."

Later, officer McGlynn went back to the scene of the collision with policeman Tibbs and measured some marks on the pavement which indicated that plaintiff's automobile was pushed east only about 15 feet.

As stated, Spruce street was 26 feet in width from curb to curb, and plaintiff, according to his evidence, was driving 2½ or 3 feet west of the east curb, and could see 10 feet west of the light pole. It would be [37] fair to say that he sat not more than 6 feet west of the right wheels of his car. On this assumption, it was 17½ feet from plaintiff to the west curb of Spruce. The distance of the pole west of the west curb on Spruce is not shown, but from a photograph in evidence it is fair to assume that the distance was at least 10 feet. On these estimates plaintiff could see west a distance of at least 27½ feet.

Plaintiff's evidence that his left window was down "enough to let the normal sounds come in"; that his eyes and ears were good; and that he looked and listened as he approached the intersection and could see 10 feet west of the light pole, but did not see the street car and did not hear the gong, was *negative* evidence. However, such evidence, in the situation, was substantial evidence tending to show that the street car was farther away from plaintiff than 27½ feet when he entered the intersection, and was traveling at a greater speed than Groves said, and such evidence also tends to show that no gong was sounded. Stotler v. Chicago & Alton Ry. Co. et al., 200 Mo. 107, 98 S. W. 509; Sing v. St. Louis-San Francisco Ry. Co. (Mo. Sup.), 30 S. W. (2d) 37.

It can hardly be said that plaintiff's evidence does not tend to show, as above stated, and defendant does not seriously contend to the contrary. The principal contention is that plaintiff was guilty of contributory negligence as a matter of law. To support such contention defendant cites Scott v. Kurn et al., 343 Mo. 1210, 126 S. W. (2d) 185; Kalbfell v. Welles et al. (Mo. App.), 49 S. W. (2d) 247; Mundy v. St. Louis-San Francisco Ry. Co. (Mo. App.), 45 S. W. (2d) 941; Nichols v. Chicago & A. R. Co. (Mo. App.), 250 S. W. 627; Freie v. St. Louis-San Francisco Ry. Co. (Mo. App.), 241 S. W. 671; Hill v. Illinois Terminal Co. (Mo. App.), 100 S. W. (2d) 40; Keene. v. Pac. Northwest Traction Co., 153 Wash. 310,

279 Pac. 756; Hartman v. Kansas City, L. & W. Ry. Co., 132 Kans. 182, 294 Pac. 913.

The Scott case, supra, was a crossing case. The railroad ran east and west, and south of the mainline track was a switch track. The train came from the west, and the plaintiff approached from the south. Plaintiff, in that case, was driving a truck. After stating the facts, the court said [126 S. W. (2d) l. c. 187]:

"It was plaintiff's duty to exercise the highest degree of care. Ordinary care would have required him to look to the west for an approaching train. Plaintiff could have, at a glance, seen the train in full view."

In the Kalbfell case, supra, the plaintiff approached the crossing driving his truck south at 10 miles per hour; the street car approached from the east; the view to the east was obstructed to within 2 feet of the track. It was held, under the facts, that the plaintiff did not exercise the care required.

The plaintiff in the Mundy case, supra, was the widow of Bryan Mundy, who, while driving his automobile, was killed in a crossing collision. It was held that the negligence of the deceased was for the jury. The court said [45 S. W. (2d) l. c. 943]:

"Plaintiff's evidence shows that deceased, under normal conditions, would have had a clear view of defendant's track to the west from the time he came within 50 feet of the track, and at the time he was killed could have seen defendant's train when it was within 200 or 300 feet of the crossing, had it not been for the dense fog then prevailing. Absent the fog and considering deceased's duty to exercise the highest degree of care for his own safety while operating an automobile on the public highway and that 'to look was to see', we would have little hesitancy in holding deceased guilty of contributory negligence as a matter of law." It is true that in the Mundy case the court made reference to the rule that, absent evidence to the contrary, the presumption obtained that Mundy was presumed to have exercised due care, but also the court observed that Mundy had a right to rely upon the statutory signals being given and that they were not given.

In the Nichols case, supra, it was held [250 S. W. 627, head-note 2] that the plaintiff was "contributorily negligent in approaching, in an automobile driven by his chauffeur, a railroad track along which a train was approaching in full view after plaintiff had come within 25 to 40 feet of the track, without looking for a train until too close to the track to stop before getting into danger; his only justification being that he was looking for trains on the main track beyond."

The Freie case, supra, was by the administrator of the estate of Herman Freie who was killed at a crossing. The railroad ran east and west, and the highway ran north and south. There were three

tracks, and beginning on the south, these were the house track, the passing track, and [38] the main track. The train approached from the east on the main track; the deceased approached from the south in an automobile, at 6 or 8 miles per hour. The view to the east on the main track was obstructed by a box car on the house track. Deceased did not look to the east after he passed the obstruction.

The facts which gave rise to the Hill case, supra, occurred in Illinois. The plaintiff was driving east on U. S. Highway No. 50; the railroad track ran north and south. Plaintiff's automobile "came into collision with a train of defendant which was being operated southwardly on defendant's tracks crossing over said public highway." An Illinois statute required that "any person approaching any highway crossing a railroad at grade to reduce the speed of his automobile so as not to exceed ten miles per hour, and at all grade crossings at which stop signs are placed to bring his automobile to a full stop before proceeding over the railroad track."

In the Hill case the court said [100 S. W. (2d) l. c. 48] : "Plaintiff admits that he failed to see the railroad crossing which he himself proved was there. He admits that he failed to see any of the crossing signs and failed to see a stop sign which, by his own exhibits, he proved were there. He admitted that he could see 50 feet ahead with his headlights, yet he testified that he traveled a distance of 35 feet of the 50 feet covered by his headlights without seeing defendant's train and did not see it until he came within 15 feet of it. His own testimony shows that he could stop his automobile within 15 to 20 feet at the rate of speed he said he was going, namely, 15 miles per hour, after he crossed the first track. It is therefore clear that he was not exercising ordinary care, because if he had been he would have seen the railroad crossing and defendant's train in sufficient time, at the speed he was going, to have stopped his automobile and thereby avoided the accident. He failed to do these things and was thereby negligent."

It will not be necessary to review other cases. Neither of the cases cited by defendant support the contention that plaintiff, in the present case, was guilty of contributory negligence as a matter of law, and, upon research of our own, we find no such case. Under the facts, we think the question of plaintiff's alleged contributory negligence was for the jury. Monroe v. Chicago & A. R. Co., 280 Mo. 483, 219 S. W. 68; Mundy v. St. Louis-San Francisco Ry. Co., supra; Malone v. St. Louis-San Francisco Ry. Co., 220 Mo. App. 9, 285 S. W. 123; Roques et al. v. Butler County R. Co. (Mo. App.), 264 S. W. 474.

■■ Is instruction D erroneous, and if so, can plaintiff complain? Instruction D is set out, supra. "An instruction on a plaintiff's contributory negligence is too general and amounts to what is commonly termed a roving commission when it fails to advise the jury

or point out in any way what acts or omissions on the part of plaintiff, if any, found by them from the evidence, would constitute contributory negligence." Pearrow v. Thompson, 343 Mo. 490, 121 S. W. (2d) 811, l. c. 815, and cases there cited. See also, Carson v. Evans et al., 351 Mo. 376, 173 S. W. (2d) 30, handed down concurrently herewith.

Measured by the rule well stated in the Pearrow case, the Carson case, and many others, instruction D is clearly erroneous, and defendant, in effect, so concedes, but argues that plaintiff, in his instruction No. 3, invited the roving commission given by instruction D and, therefore, cannot complain. Plaintiff's main instruction No. 3, among other facts hypothesized, submitted that if the jury found "that at said time the plaintiff was driving an automobile northwardly on Spruce at said intersection and was *exercising the highest degree of care* in the operation of his automobile . . . and that said collision *was not due to any negligence* of the plaintiff", etc. (italics ours).

It is pointed out in the Pearrow case [121 S. W. (2d) l. c. 815] "that the error in giving such general instruction (on contributory negligence) is not waived by plaintiff's main instruction containing a requirement, in addition to the facts essential to a verdict in his favor, for a finding to the effect that plaintiff was, at the time, exercising ordinary care, or the highest degree of care in automobile cases. Such a requirement in plaintiff's instruction merely informs the jury as to the degree of care imposed on a plaintiff." In going on to hypothesize "that said collision was not due to any negligence of the plaintiff" instruction No. 3 did no more than to exclude plaintiff's negligence in his main instruction submitting defendant's negligence. We do not think that the error in defendant's instruction D can be excused on the ground [39] that such was invited by plaintiff's instruction No. 3.

Defendant says, however, that when all the instructions are read together, there is no prejudicial error in instruction D; that "any generalness in instruction D was made clear by defendant's instructions C and E."

Instruction C told the jury that if they found "that the street car, referred to in the evidence, started to cross the intersection where said collision in question occurred, prior to the time that plaintiff's automobile was driven upon or across the street car tracks in question, if so, and if you further find that after said street car entered said intersection the plaintiff, while in the exercise of the highest degree of care, could have seen said moving street car in said intersection in time to have avoided driving upon or across said street car track in front of said street car, if so, and thereby have avoided said collision, if so, and that plaintiff failed to do so, if so, and that said collision was the direct and sole result thereof,

if so, then in such event, if you so find, your verdict should be in favor of defendant and against plaintiff."

Instruction E follows: "The court instructs the jury that if you find that at the time of the collision in question there was a heavy fog existing over the intersection in question, if so, and if you further find that plaintiff drove his automobile into said intersection and onto said street car tracks in question at a speed of 12 to 15 miles per hour, if so, and if you further find that a highly careful and prudent *automobile driver*, under *all the circumstances* then and there existing would not have operated his automobile into said intersection at said speed, if so, and if you further find that the *manner* of operating said automobile aforesaid, if so, directly and *solely* caused or directly contributed to the cause of said collision, if so, then plaintiff cannot recover in this action and your verdict should be in favor of defendant" (italics ours).

It will be noted that defendant charged plaintiff with four specific acts of negligence, and then the general charge that he failed to exercise the highest degree of care, while instruction C submitted only one of the specific charges, viz.: That plaintiff failed to yield the right of way. And it will be noted that instruction E makes the test a highly careful and prudent *automobile driver*, and not a highly careful person ("The beaten path is the safest", Donnell v. Wright et al., 199 Mo. 304, l. c. 316, 97 S. W. 928). Also, it will be noted that instruction E finally becomes a *sole cause* instruction and failed to submit any of the acts or omissions on the part of plaintiff, which would defeat recovery, except speed, and that was not submitted as a sole cause. We find nothing to excuse defendant's instruction D.

We think this case is a good place to say something about the excess of "if sos" in instructions. Neither this court nor the courts of appeals have been technical in ruling assignments that instructions *assume* facts, and there is no occasion for such superabundance of if sos, as frequently appear in instructions. Such cautionary *scotches*, so to speak, against the assumption of facts should only appear when necessary.

The order and judgment granting a new trial should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.