**Tina LASHMET, Plaintiff–Appellant,**

v.

**Frederick G. McQUEARY, M.D.,
Defendant–Respondent.**

No. 21034.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 24, 1997.

Motion for Rehearing or Transfer
Denied Oct. 15, 1997.

Application to Transfer Denied
Nov. 25, 1997.

Paul L. Redfearn & Michael D. Holzknecht, for Appellant.

Bruce E. Hunt & Jeffrey S. Monroe, for Respondent.

BARNEY, Judge.

Tina Lashmet (Plaintiff) appeals from the trial court's order which granted Frederick G. McQueary, M.D. (Defendant) a new trial.

Plaintiff brought this medical malpractice action against Defendant, other physicians and medical entities, for damages she alleged arose from their negligent failure to remove a wooden toothpick from her left foot.

Following a jury trial, a verdict was returned in Plaintiff's favor and assessed 100% of the fault against Defendant Dr. McQueary. The jury found that the other physicians and medical entities were not at fault. The jury awarded Plaintiff compensatory damages in the sum of $224,000.00. However, the trial court granted Defendant a new trial on all issues because it found that the fifth disjunctive submission of negligence, in paragraph First of Plaintiff's Instruction Number Eight, gave the jury no factual guidelines or standard to determine negligence, and therefore gave the jury a roving commission on the issue of Defendant's liability to Plaintiff.

Plaintiff raises one point of trial court error. She maintains that her fifth disjunctive submission of negligence, in Instruction Number Eight, more fully explained below, wherein the jury was asked to determine whether Defendant "failed to adequately inform and instruct the Plaintiff of the foreseeable risk of a retained toothpick in Plaintiff's foot," was not a roving commission. Therefore, she maintains that the trial court erred in granting Defendant's motion for a new trial.

I.

On February 19, 1989, Plaintiff stepped on a toothpick with her left foot in the kitchen of her home in Bolivar, Missouri. Plaintiff immediately went to the emergency room of Citizens Memorial Hospital where she received a tetanus shot and was released. On February 20, 1989, Plaintiff met with Dr. Dias, who prescribed some antibiotics for Plaintiff and suggested that she go home and keep her foot elevated. Plaintiff's foot continued to get worse, however, following her visit with Dr. Dias. On February 24, 1989, Plaintiff returned to Dr. Dias, and he again instructed her to go home and keep her left foot elevated. Plaintiff followed Dr. Dias' instructions but her foot did not improve.

On February 26, 1989, Plaintiff traveled to Springfield, Missouri, to be examined in the emergency room of St. John's Hospital. On that day, Dr. Newport made an incision in Plaintiff's left foot, removed some "debris," closed the incision, and released Plaintiff from the hospital.

Plaintiff's foot became much worse, however, after that surgical procedure was performed by Dr. Newport. Plaintiff's foot was "real red" and "a lot more swollen." On February 28, 1989, Plaintiff, pursuant to Dr. Newport's instructions, returned to St. John's Hospital. On that day, Plaintiff met with Dr. Mire, who examined her foot, gave her some antibiotics, and sent her home.

On March 10, 1989, Plaintiff returned to St. John's Hospital because her foot was still not improving and because she was experiencing "fever and chills." On that visit, Plaintiff met with Dr. Skeins, who told her she needed to have additional surgery because he believed something must still be embedded in her left foot.

Plaintiff was then referred to Defendant, a surgeon. Defendant examined Plaintiff's foot on March 10, 1989, and explained to her that her foot was in a condition to be expected following the surgery performed by Dr. Newport.

Plaintiff then met with Defendant on two separate occasions, once on March 14, 1989, and again on March 17, 1989. On those visits, Defendant explained to Plaintiff that there were no signs of "active" infection, that her left foot appeared to be "well-healed" and that he believed that Plaintiff's left foot would recover without additional medical treatment. Defendant testified that the prior incision made in her foot appeared to be healed and that he continued her "off antibiotics." He did suggest physical therapy treatment for Plaintiff's left foot. Plaintiff received no medical treatment for her left foot for almost one year following her last visit with Defendant.

Sometime during February 1990, Plaintiff met with Dr. Harris in Bolivar, Missouri,

because she was still experiencing pain and because she had developed some "knots" on the top of her left foot. Dr. Harris referred Plaintiff to Dr. Kimbrough in Springfield, Missouri. Plaintiff then met with Dr. Kimbrough and explained to him that her former doctors had previously removed a toothpick from her left foot. She told Dr. Kimbrough that "[t]hey got it out."

Dr. Kimbrough decided to hospitalize Plaintiff in early March 1990 so that an abscess could be drained from her left foot by him and Dr. Brown. At that time, Dr. Kimbrough and Dr. Brown discovered some anaerobic bacteria in Plaintiff's foot known as actinomyces. This kind of bacteria is expected when there is a puncture wound made by an object, such as a toothpick, that has been contaminated by human saliva. Plaintiff was prescribed high dosages of penicillin to control the infection in her left foot.

Plaintiff's left foot began to feel a little better but she was still experiencing pain. Drs. Kimbrough and Brown then referred Plaintiff to Dr. Robin Quinn, a neurologist. Dr. Quinn decided that Plaintiff should undergo "sympathetic blocks." This procedure would require that a catheter be placed in Plaintiff's spine and every day for one week a solution would be injected into her spine to alleviate her pain. This procedure provided some relief from Plaintiff's left foot pain.

In late 1990, Dr. Quinn decided to perform a lumbar sympathectomy on Plaintiff, a more aggressive and invasive procedure, for which Plaintiff was again hospitalized. During this procedure, the surgeons surgically removed the sympathetic nerves which affected Plaintiff's left leg and left foot. This procedure provided additional relief but Plaintiff was still experiencing pain in her left foot.

On March 19, 1991, with Plaintiff still experiencing pain, Dr. Brown performed exploratory surgery on Plaintiff's left foot, which revealed that there was three-quarter's of a wooden toothpick embedded in her left foot. This toothpick was the source of all Plaintiff's pain in her left foot. Plaintiff testified that after the toothpick was removed, "I started feeling well again."

However, Plaintiff was still suffering from residual effects of pain in her left foot. Plaintiff was also suffering from the inability to properly ambulate from having favored her left foot for more than two years from the date that the toothpick became embedded in her left foot. After the toothpick was ultimately removed, Plaintiff brought this medical malpractice action.

## II.

The trial court's grant of a new trial is presumptively correct and will be disturbed only in the event of manifest abuse of discretion. *Nguyen v. Haworth*, 916 S.W.2d 887, 888–89 (Mo.App.1996). The appellate court indulges every reasonable inference favoring the trial court's ruling. *Id.* at 888.

However, a trial court's authority to grant a new trial is discretionary only as to questions of fact, not as to matters of law. *Meyer v. McGarvie*, 856 S.W.2d 904, 907 (Mo.App.1993). Instructional error involves a question of law. *Id.* Therefore, if a new trial has been granted for such error, the appellate court must examine the record presented to determine whether the challenged instructions were erroneous and, if so, whether such instructions prejudiced the party challenging the instructions. *Id.*

In Plaintiff's sole point on appeal, she contends that the trial court erred in granting Defendant a new trial on the ground that Plaintiff's Instruction Number Eight granted the jury a roving commission. The trial court found that the fifth disjunctive submission of negligence in paragraph First of Plaintiff's Instruction Number Eight gave the jury no factual guidelines or standard to determine Defendant's negligence. We disagree.

Plaintiff's Instruction Number Eight was worded in the following manner:

Your verdict must be for the Plaintiff if you believe:

First, Defendant Fred G. McQueary either:

failed to order a CAT Scan to locate the toothpick, or

failed to order an MRI to locate the toothpick, or

failed to remove the toothpick and administer adequate antibiotics, or

failed to remove the toothpick, or

*failed to adequately inform and instruct the Plaintiff of the foreseeable risk of a retained toothpick in Plaintiff's foot,* and

Second, Defendant Fred G. McQueary, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to Plaintiff. (emphasis added).

It is the fifth submission of negligence of paragraph First, emphasized above, that the trial court found to be a roving commission.

■■■ A jury instruction amounts to a "roving commission" when it fails to advise the jury, or point out in any way, what acts or omissions on the part of the defendant, if any, found by them from the evidence, would constitute liability. *Paisley v. Kansas City Pub. Serv. Co.,* 351 Mo. 468, 173 S.W.2d 33, 38 (1943); *see also Spain v. Brown,* 811 S.W.2d 417, 420–21 (Mo.App.1991); *Douglas v. Hoeh,* 595 S.W.2d 434, 438 (Mo.App.1980). A jury instruction may also be considered a roving commission when it is "too general." *Paisley,* 173 S.W.2d at 38. Where an instruction submits a question to the jury in a broad, abstract way without being limited to any issues of fact or law developed in the case, it may be considered a "roving commission." *Gillioz v. State Highway Comm'n,* 348 Mo. 211, 153 S.W.2d 18, 26 (1941).

■■■ Rule 70.02(b)[1] provides: "[W]here there is no applicable MAI ... such instruction shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." *See Stone v. Duffy Dist., Inc.,* 785 S.W.2d 671, 678 (Mo.App.1990). The test of a modified MAI, as in the above instruction, is whether it follows the substantive law and can be readily understood by the jury. *Smith v. Kovac,* 927 S.W.2d 493, 497 (Mo.App.1996). MAI contemplates that the jury will be properly advised by the argument of counsel and the trial testimony regarding factual details so that the jury will understand its instructions. *See Stone,* 785 S.W.2d at 678. "The criteria in determining whether an instruction is correct or fails is whether an average juror would correctly understand the applicable rule of law, and whether a jury was not or could not be confused or misled, resulting in prejudice to one of the parties." *Id.*

Defendant testified that he was contacted by Dr. Skeins on March 10, 1989, and was given a history that Plaintiff had stepped on a toothpick with her left foot and that she had undergone surgery in an attempt to remove same. Defendant testified that he was aware that Plaintiff had found about half of the toothpick on her floor, but that Plaintiff was unable to locate the remaining half, presuming it was embedded in her left foot. Defendant testified that after his examination of Plaintiff, his diagnosis was that Plaintiff had a "potential" for a retained foreign body in her left foot.

Defendant did not order an MRI or CAT scan on Plaintiff's left foot and acknowledged that he did not prescribe antibiotics for Plaintiff. He further acknowledged that he wanted Plaintiff's body to mount its own response to any embedded toothpick to "make it easier to remove the toothpick, yes, assuming that it was there." Defendant testified that he could not specifically recall telling Plaintiff that he was not resuming antibiotics treatment so that her body would mount its own inflammatory response to a retained foreign body. Defendant did state, however, that "[a]nytime I do that with any patient, it's my practice to do so, yes." However, in so refraining from giving Plaintiff antibiotics, Defendant made no notation in the record that he was following this course of action.

Defendant further acknowledged that it would have been very important for Plaintiff to understand the consequences of having a retained foreign body in her left foot, but that after seven years, he did not specifically

---

1. All Rule references are to Missouri Court Rules (1997), unless otherwise indicated.

recall having such an explanatory conversation with Plaintiff.

Defendant also testified that he believed that Plaintiff may have been suffering from localized reflex sympathetic dystrophy (RSD). Defendant stated that RSD could be caused "from a very minor bump to a very major injury to lacerations to penetrating injuries to fractures to sprains." Defendant testified that RSD is a condition of pain, the cause of which is not immediately ascertainable. Defendant believed that this was a possibility because although Plaintiff had symptoms of infection, his examination revealed no "aggressive infection." Defendant suggested that Plaintiff undergo physical therapy treatment for her left foot.

Defendant also testified that after his final visit with Plaintiff, he made no attempt to contact Plaintiff to inform her about needing further medical treatment. He acknowledged that it was important for Plaintiff to have returned for follow up visits because of the possibility of the toothpick being embedded in Plaintiff's left foot. However, throughout Defendant's testimony, he stated that he did not recall having any specific conversations with Plaintiff regarding the risks associated with having a retained foreign body in her left foot, but was otherwise certain that the matter had been discussed with her.

Plaintiff, on the other hand, testified that Defendant "never" indicated to her that he was concerned that there may be part of a toothpick in her left foot. Plaintiff testified that during each of her visits with Defendant, she explained to him that her left foot was causing her much pain and that she was unable to apply pressure to the front part of her left foot.

Plaintiff testified that "[h]e [Defendant] told me that I was babying it and I needed to start walking on it and get over it. He [Defendant] gave me a little round thing . . . to stick in my shoe to help me walk on the ball of my foot and told me to quit babying it, to get over it." Defendant did not deny having told Plaintiff to stop "babying" her left foot.

Plaintiff testified that Defendant never had any discussions with her regarding his concern that the toothpick was still embedded in her left foot or that her left foot would require additional medical treatment. Plaintiff further testified that the reason she did not go back to see Defendant after her last visit was that

> I felt like he was telling me I was being a baby, to walk on it—I mean, to get over it. And so that's what I did. I went home and I walked on it and I finally got off the crutches and then I broke my other foot but, I mean, I did what he told me. I didn't want to—if that's all he could do for it, I didn't want to be going back. And he already told me I was being a baby, so I was just doing what he told me to do.

Plaintiff testified that she did not receive any instructions or warnings from Defendant regarding the consequences of leaving a retained foreign body in her left foot.

### III.

The elements of a claim for medical malpractice are: (1) an act or omission by the defendant that failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently, and (3) a causal connection between the act or omission and the plaintiff's injury. *Kovac*, 927 S.W.2d at 496.

The test for negligence in this case was whether Defendant failed to exercise that degree of skill and learning ordinarily exercised under the same or similar circumstances by the members of his profession. *Id.* The nature of Defendant's duty to Plaintiff under the circumstances of this case must be established by expert medical testimony. *Id.* Once the duty is established, whether Defendant was negligent under the evidence becomes a jury question. *Id.* at 496–97.

Here, Defendant acknowledged in his testimony that it would have been very important for Plaintiff to understand his recommended course of treatment and the potential for harm which could result from a retained foreign body in Plaintiff's foot.

Plaintiff's expert, Dr. Frank Baker, testified that a doctor has a duty to instruct and inform a patient about a course of treatment for a retained foreign body. "If you're going to wait for something to develop, you need to give the patient the instructions on what to look for." He further stated that "if you're hoping or expecting something to develop, you have to warn the patient as to what they should expect because that's going to be the index for them on when to come back." Dr. Baker further testified that "one of the caveats of dealing with foreign bodies is that unless you're absolutely sure you have the whole thing out ... [w]e tell the patient, you know, you may have a retained foreign body ... I can't tell at this time, and we're going to need to do additional tests in order to determine whether you do or don't."

Dr. Baker also related that one of the foreseeable risks associated with retained foreign bodies is osteomyelitis, which is an infection of the bone and "a real serious problem." Other foreseeable risks include infections that destroy tissue, the formation of scar tissue, and other bacterial infections that could become "quite lethal."

■ We note that issues relating to the weight, credibility, or the resolution of conflicts in testimony are matters for a jury's determination and are not matters for appellate review. *See Brandt v. Csaki*, 937 S.W.2d 268, 273 (Mo.App.1996); *Martin v. Durham*, 933 S.W.2d 921, 925 (Mo.App.1996); *Roark Motor Lodge Interval Sales Corp. v. Lindner*, 779 S.W.2d 684, 686 (Mo.App.1989).

Defendant relies on the holdings in *St. Joseph's Hosp. v. Schierman*, 829 S.W.2d 4 (Mo.App.1991) and *Grindstaff v. Tygett*, 655 S.W.2d 70 (Mo.App.1983) to support a finding that the submission in the instant matter granted the jury a "roving commission." However, the present matter is distinguishable from *Schierman* and *Grindstaff*.

In *Schierman*, the challenged submission asked the jury whether the defendant physician "failed to adequately communicate with [the hospital emergency room physician] regarding the giving of Aramine." *Schierman*, 829 S.W.2d at 6. This instruction required a jury of laymen to determine whether nonspecific medical information communicated by one medical expert to the other was adequate for the second medical expert to properly treat the patient. *See Kampe v. Colom*, 906 S.W.2d 796, 805 (Mo.App.1995).

Similarly, the instruction in *Grindstaff* required the jury to determine whether "defendant performed a midforceps rotation delivery when such procedure was not medically proper." *Grindstaff*, 655 S.W.2d at 72. The court of appeals held that the phrase "not medically proper" failed to submit the ultimate facts which defined the specific theory of negligence. *Id.* at 73. As in *Schierman*, the instruction required the jury to speculate and utilize medical expertise that it did not possess. The defective submission in *Grindstaff* permitted the jury to determine that uncertain professional conduct was not medically appropriate. *See Kampe*, 906 S.W.2d at 805.

On the other hand, in *Kampe*, plaintiff Carl Kampe's third disjunctive submission of negligence in plaintiff's verdict director, recited that the jury was to assess a percentage of fault to defendant Dr. Colom, if the jury believed that Dr. Colom "failed to *monitor* the medications he prescribed for Carl Kampe." *Kampe*, 906 S.W.2d at 804 (emphasis added). On appeal, Dr. Colom contended that this submission of negligence constituted a roving commission because it allowed the jury to speculate and determine for itself the unstated specific theory of recovery. *Id.*

In finding no roving commission in the use of the word "monitor," the *Kampe* court stated that "[n]either is the word 'monitor' a scientific word that expert testimony must define to aid the jury ... the word is not an infrequently used word or a word of specific legal meaning that should be defined for the jury." *Id.* The court declared that the word "monitor," as used in the context of the instruction, was sufficiently explicit and that *the exact method* by which Dr. Colom monitored the amount of medication prescribed and ingested by Mr. Kampe, as Dr. Colom's patient, "need not be determined by the jury." *Id.*

■ In reviewing jury instructions, jurors should be credited with ordinary intelligence, common sense, and an average under-

standing of the English language. *Kovac,* 927 S.W.2d at 498. In the instant matter, in the context of the evidence presented, the words "adequately inform and instruct" are not scientific words that expert testimony must define to aid the jury.

The words are not ambiguous or confusing and do not compel the jury to employ an expertise that it lacks. *See Kampe,* 906 S.W.2d at 805. The words are not infrequently used, and in the context of their use, have no scientific meaning that should be defined for the jury. To a reasonable person on the jury, the words "failed to adequately inform and instruct the Plaintiff of the foreseeable risk of a retained toothpick in Plaintiff's foot" when applied to the evidence in this case, denotes a meaning of whether Defendant made Plaintiff sufficiently aware of the risks of her having a retained foreign object in her foot and the necessity of receiving further medical treatment for it. To hypothesize the details of the evidence relating to this instruction would be precisely what Rule 70.02(b) condemns. *See Stone,* 785 S.W.2d at 678.

The fifth disjunctive submission of negligence of paragraph First of Instruction Number Eight was not misleading or confusing, and did not permit the jury to speculate and determine on its own why and in what manner Defendant's instructions to Plaintiff, if any, were inadequate. *See id.* It sufficiently tracked the testimony of Plaintiff's expert, Dr. Baker, relating to Defendant's failure to satisfactorily inform and instruct the Plaintiff of the foreseeable risk of a retained toothpick in her foot. *See Wilson v. Lockwood,* 711 S.W.2d 545, 553 (Mo.App. 1986).

 Since Plaintiff's theory was supported by the evidence and submitted the ultimate facts which defined for the jury Plaintiff's specific theory of negligence, it did not grant the jury a roving commission. *See Kampe,* 906 S.W.2d at 805. A court should reverse an instruction only for defects of substance with substantial potential for prejudicial effect. *Kovac,* 927 S.W.2d at 499. Point I is granted.

Lastly, contrary to Defendant's arguments in his brief, we find that elements one through four of Plaintiff's verdict director against Defendant (Instruction Number Eight) are supported by substantial and competent evidence adduced during the trial.

The trial court's order granting a new trial is reversed and remanded with instructions that the trial court reinstate the original jury verdict and enter judgment accordingly. *See, e.g., Sanders v. National R.R. Passenger Corp.,* 930 S.W.2d 36, 40 (Mo.App.1996); *Robinson v. Safeway Stores, Inc.,* 655 S.W.2d 617, 623 (Mo.App.1983).

PARRISH, P.J., concurs in separate opinion.

MONTGOMERY, C.J., concurs.

PARRISH, Presiding Judge, concurring.

I concur. I write separately to emphasize that the sufficiency of a factual allegation in a jury instruction concerning conduct that constitutes negligence depends on the evidence adduced.

In this case the issue the "fifth disjunctive submission of negligence" in Instruction No. 8 addressed was whether Dr. McQueary informed Ms. Lashmet that she might still have part of the toothpick in her foot. Unlike the facts in *St. Joseph's Hospital of Kirkwood v. Schierman,* 829 S.W.2d 4 (Mo. App.1991), this issue involved only one theory upon which Ms. Lashmet could recover, whether an understandable warning of the danger had been communicated to Ms. Lashmet by Dr. McQueary. She contended he gave no warning of the danger. He had no record or recollection of giving any specific warning, but contended his "practice" was to give a warning. Under these facts the instruction did not permit the jury "to roam freely through the evidence and choose any facts which suited it[s] fancy or its perception of logic." *Davis v. Jefferson Savings & Loan Ass'n,* 820 S.W.2d 549, 556 (Mo.App. 1991).

Notwithstanding the foregoing, a warning is appropriate concerning the use of the particular language that is found acceptable in the instruction in this case. The holding in this case should not be taken to mean that the language "failure to adequately inform"

of a "foreseeable risk" would be sufficient in instructions in other cases having different facts. The sufficiency of a jury instruction must be viewed in light of the evidence in the particular case in which it is given.